#26435-a-LSW
**2013 S.D. 29**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

HANSON FARM MUTUAL
INSURANCE COMPANY OF
SOUTH DAKOTA,                                        Plaintiff and Appellee,

    v.

MARCUS DEGEN,                                        Defendant and Appellant,

    and

TINA SELLERS, AS PERSONAL
REPRESENTATIVE OF THE ESTATE
OF ADRIANNA SUMMER SELLERS,          Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
HANSON COUNTY, SOUTH DAKOTA
\* \* \* \*

THE HONORABLE SEAN M. O'BRIEN
Retired Judge
\* \* \* \*

CRAIG A. KENNEDY of
Kennedy, Pier & Knoff, LLP
Yankton, South Dakota                        Attorneys for plaintiff
                                                              and appellee.


DOUGLAS M. DAILEY of
Morgan Theeler, LLP
Mitchell, South Dakota                        Attorneys for defendant
                                                              and appellant Marcus Degen.

ROLLYN H. SAMP
Sioux Falls, South Dakota                    Attorney for defendant
                                                              and appellant Tina Sellers.

\* \* \* \*

CONSIDERED ON BRIEFS
ON FEBRUARY 12, 2013
OPINION FILED **04/03/13**

#26435

WILBUR, Justice

[¶1.]        Tina Sellers, as the personal representative of her daughter's estate, and Marcus Degen appeal the trial court's determination that Hanson Farm Mutual Insurance Company of South Dakota (HFMIC) had no obligation to indemnify or to defend Marcus in an underlying wrongful death action. We affirm.

## FACTS AND PROCEDURAL HISTORY

[¶2.]        Marcus and Tina met in the spring of 2006 at work. Their work relationship quickly developed into a romantic one. At that same time, Marcus was living with his parents. Tina and her daughters, Adrianna and Zeraya, were living between an apartment and with her parents while Tina was in the process of divorcing the girls' father.

[¶3.]        As their relationship progressed, Tina and Marcus began to look for a home in Alexandria, South Dakota, Marcus's hometown. After finding a house they liked, Marcus purchased the home in February 2007. As a part of qualifying for a home loan, Marcus also purchased a homeowner's insurance policy with HFMIC. Marcus was the named insured on the policy. The policy defined certain specific terms that it used. "Insured" was defined in part as:

>    a.    "you";
>    b.    "your" relatives if residents of "your" household;
>    c.    persons under the age of 21 residing in "your" household and in "your" care or in the care of "your" resident relatives;
>    . . .

The policy also contained a household exclusion, which read: "Coverage L [personal liability coverage] does not apply to: . . . 'bodily injury' to 'you', and if residents of 'your' household, 'your' relatives and persons under the age of 21 in 'your' care or in

-1-

the care of 'your' resident relatives." "[I]n 'your' care" was not defined in the policy nor did the policy place a specific time frame as to when "care" had to be rendered in order to fit the definition. "Bodily injury" was defined to "include[ ] sickness, disease, or death."

[¶4.]     Marcus, Tina, and both of Tina's daughters moved into the home. Marcus and Tina then began to fix up the house, purchasing furniture, appliances, and other necessities within their financial means.

[¶5.]     Following Marcus and Tina's move to Alexandria, Marcus and Tina enrolled Adrianna in school. In addition to Tina and the family doctor, Marcus was listed as one of the girls' emergency contacts.

[¶6.]     A few months after moving into the house in Alexandria, Tina took a position with a different company with hours that allowed her to start work later in the morning and leave work earlier in the afternoon. This schedule enabled Tina to get the girls ready in the morning and pick them up in the afternoon. Marcus got the girls ready for the day and picked them up in the afternoon when Tina was unable to do so.

[¶7.]     Even though they maintained separate checkbooks, Marcus and Tina pooled their financial resources to pay their monthly expenses with each helping the other out in the event that there was a shortfall in finances. Marcus paid the mortgage on the home, insurance, real estate taxes, and all of the utilities. Tina bought groceries for Marcus, the girls, and herself. She also purchased the girls' clothing and school supplies. Tina's purchases were supplemented by monthly child support payments from Tina's ex-husband. Marcus and Tina each paid for their

own fuel for their vehicles. Additionally, the couple divided the household duties evenly.

[¶8.] During this time, the couple also discussed and participated in various facets of the girls' lives, including appropriate discipline, education, religion, and recreation activities. Marcus and Tina discussed and developed a plan to discipline the girls and Marcus or Tina disciplined the girls when they misbehaved. Additionally, Marcus helped Adrianna with learning her alphabet and numbers, and read books to the girls at night. Marcus, Tina, and the girls all attended a local church because Marcus and Tina agreed that it would be best for the girls. Together, they would often watch movies, play outside, and camp in the local park. Both Marcus and Tina tucked the girls in bed at night and told the girls that they loved them. The girls returned this affection to both Marcus and Tina. The girls often called Marcus "Dad" and he considered them his daughters. Marcus also purchased birthday and Christmas presents for the girls. Lastly, Marcus named Adrianna as the primary beneficiary in his retirement plan and Zeraya as the secondary beneficiary.

[¶9.] Despite this relationship, Marcus never adopted the girls. Their biological father maintained his parental rights and paid child support monthly. Additionally, even though both Marcus and Tina hoped the relationship would last forever, Marcus and Tina never discussed marriage or an engagement.

[¶10.] On the evening of October 27, 2007, Marcus was leveling dirt on the property with a skid loader. Later, Tina and Adrianna joined Marcus outside. Tragically, while operating the skid loader, Marcus, hit and killed Adrianna.

Following the accident, Marcus, Tina, and Zeraya continued to live together for more than a year until the difficulty in dealing with the accident caused the couple to split. Tina then pursued a wrongful death action against Marcus.

[¶11.]     Based on the household exclusion, HFMIC filed a declaratory judgment action and asked the trial court to determine whether HFMIC had an obligation to indemnify or to defend Marcus in the underlying wrongful death action. Additionally, HFMIC filed a motion for summary judgment and a hearing on that motion was held. In a memorandum decision, the trial court concluded that the phrase in the insurance contract "in 'your' care" was unambiguous, and yet denied HFMIC's motion on the basis that issues of material fact existed as to whether Adrianna was in Marcus's care.

[¶12.]     A court trial on the declaratory judgment was held on June 19, 2012. Marcus and Tina both testified. The trial court ruled in favor of HFMIC and determined that Adrianna was in Marcus's care and therefore excluded from coverage under the household exclusion contained in the policy. Both Tina, as personal representative of her daughter's estate, and Marcus appeal.

[¶13.]     The issues on appeal are:

1.     Whether the phrase "in 'your' care" is ambiguous as it relates to coverage under a homeowner's insurance policy.

2.     Whether the trial court erred in concluding that Adrianna was in Marcus's care and therefore excluded from coverage under the household exclusion contained in the policy.

## STANDARD OF REVIEW

[¶14.]        "We review declaratory judgments as we would any other order, judgment, or decree." *Mid-Century Ins. Co. v. Lyon*, 1997 S.D. 50, ¶ 4, 562 N.W.2d 888, 890 (citing SDCL 21-24-13) (additional citation omitted). "A trial court's findings of fact are examined under a clearly erroneous standard and its conclusions of law under a de novo standard." *Id.* Additionally, "[i]nsurance contract interpretation is a question of law, reviewable de novo." *Ass Kickin Ranch, LLC v. N. Star Mut. Ins. Co.*, 2012 S.D. 73, ¶ 7, 822 N.W.2d 724, 726 (quoting *De Smet Ins. Co. of S.D. v. Gibson*, 1996 S.D. 102, ¶ 5, 552 N.W.2d 98, 99). "This includes determining whether an insurance contract is ambiguous." *Id.* (quoting *Roden v. Gen. Cas. Co. of Wis.*, 2003 S.D. 130, ¶ 6, 671 N.W.2d 622, 625).

## ANALYSIS AND DECISION

[¶15.]        **1.        Whether the phrase "in 'your' care" is ambiguous as it relates to coverage under a homeowner's insurance policy.**

[¶16.]        Marcus and Tina contend that the phrase "in 'your' care" is ambiguous. They argue that an ambiguity exists because "care" has several different dictionary definitions and a number of courts have utilized different definitions for the term "care." Marcus and Tina also assert that the phrase is susceptible to two different interpretations in that one interpretation of the phrase may invoke the exclusion if the child is "in '[the insured's]' care" at the moment of the occurrence for which coverage is sought and another interpretation may invoke the exclusion if the child has ever been "in '[the insured's]' care."

[¶17.]     Initially, we note that whether or not the phrase "in 'your' care" is ambiguous as used in the insurance policy is an issue of first impression for this Court. We have recently reviewed the law on insurance contract interpretation:

> The scope of coverage of an insurance policy is determined from the contractual intent and the objectives of the parties as expressed in the contract. When an insurer seeks to invoke a policy exclusion as a means of avoiding coverage, the insurer has the burden of proving that the exclusion applies. Where the provisions of an insurance policy are fairly susceptible to different interpretations, the interpretation most favorable to the insured should be adopted. However, this rule of liberal construction in favor of the insured and strictly against the insurer applies only where the language of the insurance contract is ambiguous and susceptible of more than one interpretation . . . . The fact that the parties differ as to the contract's interpretation does not create an ambiguity.
>
> Further, a court may not seek out a strained or unusual meaning for the benefit of the insured. Instead, an insurance contract's language must be construed according to its plain and ordinary meaning and a court cannot make a forced construction or a new contract for the parties. Essentially, this means that when the terms of an insurance policy are unambiguous, these terms cannot be enlarged or diminished by judicial construction. Finally, insurance policies must be subject to a reasonable interpretation and not one that amounts to an absurdity.

*Id.* ¶¶ 9-10 (internal citations and quotation marks omitted).

[¶18.]     In examining the phrase "in 'your' care[,]" as stated within the policy, we construe the language of the contract "according to its plain and ordinary meaning" with our focus specifically on the word "care." *Id.* ¶ 10 (additional citation and quotation marks omitted). The Merriam-Webster online dictionary defines "care" in pertinent part as "painstaking or watchful attention"; "charge, supervision"; and "a person or thing that is an object of attention, anxiety, or solicitude[.]" *Care*, Merriam-Webster Online Dictionary, http://www.merriam-

webster.com/dictionary/care (last visited March 25, 2013). Thus, the plain and ordinary meaning of "care" is akin to the charge or supervision of another. Additionally, there is nothing contained within the plain and ordinary meaning of the word "care" nor in the insurance policy that attaches a specific time frame to when such "care" is rendered.

[¶19.] Other courts and persuasive authority faced with this same issue have defined the word "care" "as the function of watching, guarding or overseeing and is typically associated with the supervision of children and other physically vulnerable or dependent individuals such as the elderly or infirm." 9A *Couch on Insurance* 3d § 128:11 (2012). *See Oliva v. Vt. Mut. Ins. Co.*, 842 A.2d 92, 96 (N.H. 2004) (concluding that "the phrase 'in the care of' connotes a level of support, guidance and responsibility that is most often present in situations where an insured cares for a minor child, an elderly person or an incapacitated individual"); *Mitsock v. Erie Ins. Exch.*, 909 A.2d 828, 832-33 (Pa. Super. Ct. 2006) (quoting *Oliva*, 842 A.2d at 96) (concluding that "in the care of" "connote[s] a level of support, guidance and responsibility that is most often present in situations where an insured cares for a minor child, an elderly person, or an incapacitated individual"); *Priest v. Roncone*, 851 A.2d 751, 755 (N.J. Super. Ct. App. Div. 2004) (providing the definition of "care" as "the function of watching, guarding or overseeing" . . . "the supervision of children and other physically vulnerable or dependent individuals such as the elderly or infirm"); *Am. Family Mut. Ins. Co. v. Wemhoff*, 972 S.W.2d 402, 406 (Mo. Ct. App. 1998) (defining "care" as "charge; protection; custody").

[¶20.]     Moreover, other jurisdictions have determined that the phrase "in the care of" is unambiguous. *See State Farm Fire & Cas. Co. v. Odom*, 799 F.2d 247, 250 (6th Cir. 1986); *Oliva*, 842 A.2d at 95; *Henderson v. State Farm Fire & Cas. Co.*, 596 N.W.2d 190, 194 (Mich. 1999); *State Farm Fire & Cas. Co. v. Breazell*, 478 S.E.2d 831, 833 (S.C. 1996); *Mitsock*, 909 A.2d at 833; *Priest*, 851 A.2d at 755; *Cierzan ex rel. Weis v. Kriegel*, 655 N.W.2d 217, 221 (Wis. Ct. App. 2002) (determining the phrase to be unambiguous and stating that "[t]he mere fact that a word has more than one dictionary meaning does not necessarily make the word ambiguous if only one meaning applies in the context and comports with the parties' objectively reasonable expectations"). *But see Or. Mut. Ins. Co. v. Clemens*, 861 P.2d 372, 375 (Or. Ct. App. 1993) (additional citation omitted) (stating that the phrase "in your care" was ambiguous because "it 'could reasonably be given a broader or narrower meaning, depending upon the intention of the parties in the context in which such words are used by them'"). Based on the plain and ordinary meaning of the word "care," we conclude that the phrase "in 'your' care" is unambiguous and most appropriately interpreted in the context of the policy as "under the insured's charge or supervision" without straining to attach a specific moment in time to when such "care" is rendered.

[¶21.]     Even though we have defined "in 'your' care" and determined that it is unambiguous, its legal application is also a question of first impression for this Court. In aiding our determination of whether an individual is "in '[the insured's]' care[,]" we adopt the eight-factor test utilized in *Oliva* and other jurisdictions. *See* 842 A.2d at 96. *See also Henderson*, 596 N.W.2d at 195-96 (using the eight-factor

test); *Mitsock*, 909 A.2d at 833 (same); *Priest;* 851 A.2d at 755-56 (same); *Cierzan*, 655 N.W.2d at 221-22 (same). Accordingly, a fact finder should consider the following non-exclusive factors in determining whether an individual is "in '[the insured's]' care":

> 1.    [I]s there a legal responsibility to care for the person;
> 2.    [I]s there some form of dependency;
> 3.    [I]s there a supervisory or disciplinary responsibility;
> 4.    [I]s the person providing the care providing substantial essential financial support;
> 5.    [I]s the living arrangement temporary or permanent, including how long it has been in existence and is expected to continue;
> 6.    [W]hat is the age of the person alleged to be "in the care of" another (generally, the younger the person the more likely they are to be "in the care of" another);
> 7.    [W]hat is the physical or mental health status of the person alleged to be "in the care of" another (a person with health problems is more likely to be "in the care of" another); and
> 8.    [I]s the person allegedly "in the care of" another gainfully employed (a person so employed is less likely to be truly dependent on another)?

*Oliva*, 842 A.2d at 96. *See* 9A *Couch on Insurance* 3d § 128:11 (2012) (also listing the eight-factor test to be used in determining whether an individual is in the insured's care).

[¶22.]    **2.    Whether the trial court erred in concluding that Adrianna was in Marcus's care and therefore excluded from coverage under the household exclusion contained in the policy.**

[¶23.]    Marcus and Tina argue that the trial court erroneously found that Adrianna was in Marcus's care. HFMIC counters that the trial court properly utilized the eight-factor test set forth in *Oliva* and correctly determined that Adrianna was in Marcus's care, and therefore excluded from coverage. 842 A.2d at

96. In support of its argument that the policy exclusion applied, HFMIC presented the adverse testimony of both Marcus and Tina. *See Ass Kickin Ranch, LLC*, 2012 S.D. 73, ¶ 9, 822 N.W.2d at 727 (quoting *Opperman v. Heritage Mut. Ins. Co.*, 1997 S.D. 85, ¶ 4, 566 N.W.2d 487, 489) (stating "[w]hen an insurer seeks to invoke a policy exclusion as a means of avoiding coverage, the insurer has the burden of proving that the exclusion applies").

[¶24.] We initially note that, while Marcus and Tina argue that Adrianna was not "in fact" in Marcus's care, the facts in this appeal are essentially undisputed. The parties' dispute lies in the trial court's application of the law to the undisputed facts. Thus, the resolution of this dispute requires us to review the record de novo.

[¶25.] In applying the eight-factor test to the undisputed facts, the record demonstrates that, while Marcus had no legal responsibility for the girls, Adrianna and Zeraya depended on Marcus for various facets of their well-being. The girls were dependent on Marcus to provide them with shelter. He paid the mortgage, insurance, real estate taxes, and utilities on the house. Additionally, Marcus and Tina equally divided the household duties in order to provide a suitable home for the girls.

[¶26.] In addition to material needs, the record indicates that Marcus also provided for the girls' emotional needs. He participated in making decisions concerning the girls' educational and religious activities. Further, Marcus and the girls each showed affection for one another with the girls referring to Marcus as "Dad" and Marcus considering the girls his daughters. Lastly, Marcus, Tina, and

the girls participated as a family in recreational activities, such as going camping and playing outside.

[¶27.]    The record further demonstrates that Marcus supervised and disciplined the girls. Marcus and Tina discussed and developed a plan to discipline the girls. And Marcus or Tina would discipline the girls when they misbehaved. Further, there is evidence in the record that Marcus would occasionally care for the girls by himself. Marcus was also listed as an emergency contact on Adrianna's school records, which further bolsters his supervisory authority.

[¶28.]    There is evidence that Marcus was providing substantial essential financial support for the girls. Tina and Marcus pooled their separate finances to pay for the monthly expenses, with each helping the other out in the event that there was a shortfall in finances. Marcus paid the mortgage for the home as well as all of the utilities, real estate taxes, and insurance. Tina provided groceries for Marcus, the girls, and herself. She also purchased clothing and school supplies for the girls supplemented by child support payments. Further, Tina testified that she could not afford a similar living arrangement based on her own income. Lastly, as additional evidence of his financial support, Marcus listed Adrianna and Zeraya as beneficiaries of his retirement policy.

[¶29.]    The record also demonstrates that, while not married or engaged, Marcus and Tina had planned to continue the joint living arrangement indefinitely. Marcus and Tina both testified that it was their plan to stay together for the rest of their lives. At the time of the accident, the couple and the girls had been living together for eight months. Following the accident, Tina and Zeraya continued to

live with Marcus for a year, until the accident took its toll on Tina and Marcus's relationship.

[¶30.]    Lastly, at the time of the accident, Adrianna was six years old and in good mental and physical health. Because of her young age, Adrianna was not employed. Based on application of the eight-factor test to these undisputed facts, the trial court correctly concluded that Adrianna was in Marcus's care. Accordingly, Adrianna was therefore excluded from coverage under the household exclusion contained in the policy.

## CONCLUSION

[¶31.]    The trial court correctly concluded that the phrase "in your care" was unambiguous. Additionally the trial court did not err in concluding that Adrianna was in Marcus's care. Because she was in Marcus's care, Adrianna was therefore excluded from coverage under the household exclusion contained in the policy. Therefore, we affirm the trial court's determination that HFMIC had no obligation to indemnify or to defend Marcus in the underlying wrongful death action.

[¶32.]    GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and SEVERSON, Justices, concur.