#29000-a-PJD
**2021 S.D. 35**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

In the Matter of the CERTIFICATION OF A QUESTION OF LAW FROM THE
UNITED STATES DISTRICT COURT, DISTRICT OF SOUTH DAKOTA,
CENTRAL DIVISION, Pursuant to the Provisions of SDCL 15-24A-1, and
Concerning Federal Action Civ. 3:18-cv-03015-RAL, Titled as Follows:

* * * *

| | |
|---|---|
| JOSEPH SAPIENZA and SARAH JONES SAPIENZA, M.D., | Plaintiffs, |
| v. | |
| LIBERTY MUTUAL FIRE INSURANCE COMPANY, | Defendant. |

* * * *

ORIGINAL PROCEEDING

* * * *

ANGELA BERANEK BRANDT of
Larson King, LLP
Saint Paul, Minnesota                         Attorneys for plaintiffs.


CHRISTIAN A. PREUS of
Bassford Remele, P.A.
Minneapolis, Minnesota

JACK H. HIEB of
Richardson, Wyly, Wise
    Sauck & Hieb, LLP
Aberdeen, South Dakota                        Attorneys for defendant.

* * * *

ARGUED NOVEMBER 5, 2019
REASSIGNED APRIL 9, 2021
OPINION FILED **06/02/21**

#29000

DEVANEY, Justice (on reassignment).

[¶1.] The United States District Court for the District of South Dakota filed a certified question asking this Court to interpret a liability coverage provision at issue in a pending lawsuit filed by Joseph Sapienza and Sarah Jones Sapienza, M.D., against their insurance carrier, Liberty Mutual Insurance Company. We conclude that the costs the Sapienzas incurred in complying with an injunction constitute "damages" under Liberty Mutual's policies.

## Background

[¶2.] The Sapienzas purchased a home in 2014 in the McKennan Park Historic District in Sioux Falls, South Dakota. They initially planned to renovate it, but then decided to raze the existing home and construct a new one. After the Sapienzas' proposed design plan was approved by the Sioux Falls Board of Historic Preservation, they hired a contractor who redrew the plans, submitted them to the City of Sioux Falls, and obtained a building permit. The plans indicated that the new home would comply with the maximum height and setback requirements under applicable City ordinances. Construction began in October 2014.

[¶3.] Pierce and Barbara McDowell live in and own a home next to the Sapienzas' lot. The McDowells' home is listed on the state and national registers of historic places and is designated as a "contributing property" due to its historical and architectural significance. As construction progressed on the Sapienzas' home, the McDowells became concerned about the new home's proximity and size. In May 2015, the McDowells obtained an inspection of their chimney, and the fire inspector told them that they could no longer use their wood-burning fireplace. The inspector

explained that a city ordinance requires a chimney to extend at least two feet above the highest point of any structure located within ten horizontal feet, and the eaves of the Sapienzas' home stood ten feet above and were within six feet of the McDowells' chimney.

[¶4.] After the McDowells received the inspector's report, their attorney sent the Sapienzas a letter informing them of the height and setback violations and threatened legal action if they did not cease and desist construction. The Sapienzas nevertheless continued construction, prompting the McDowells to commence a lawsuit against the Sapienzas alleging negligence and nuisance claims. The McDowells asserted that after completion, there was only seven feet of space between their home and the Sapienzas' home, which violated applicable administrative regulations governing height, mass, and scale. The McDowells further claimed that they were prohibited from using their fireplace because of the close proximity and height of the Sapienzas' home. The McDowells also asserted that the Sapienzas' home detrimentally affected the historic and sentimental value of their home, blocked a substantial amount of natural sunlight from the south, and invaded the privacy of their home by having windows that overlook the McDowells' windows (including the window into the bathroom and bedroom of their daughter). In addition to injunctive relief, the McDowells' complaint sought "compensatory, general, special, consequential and punitive damages in an amount to be determined to compensate [the McDowells] for all injuries sustained as a result of the conduct of [the Sapienzas.]"

[¶5.] The Sapienzas' liability insurance carrier, Liberty Mutual, agreed to defend against the McDowells' suit under the Sapienzas' Homeowners Policy and a Personal Liability Policy ("the policies"), which provided excess coverage. After a three-day court trial, the court issued a memorandum decision granting the McDowells a permanent injunction. On the negligence claim, the court determined that the Sapienzas had failed to comply with administrative regulations governing the height of new construction in historic districts. The court also concluded, on the nuisance claim, that the size and proximity of the Sapienzas' home blocked the natural light to the McDowells' home and "effectively" resulted in the McDowells having no use of their fireplace.

[¶6.] After finding the Sapienzas liable for the harm caused to the McDowells' property, the court then examined whether the McDowells were entitled to injunctive relief requiring the Sapienzas "to reconstruct or relocate their residence in order to satisfy their breach of law or resolve the alleged nuisance." The court concluded that without such relief, the McDowells would continue to suffer harm because "[t]heir historic property will no longer be allowed to utilize the fireplace"; "the character of their residence is devastated"; and the value of their residence had declined. In the court's view, "these facts are enough to show that the harm is irreparable and unable to be cured by monetary compensation." After considering all of the factors pertinent to a request for injunctive relief, the court granted the McDowells a permanent injunction, ordering the Sapienzas to either bring their residence into compliance with the applicable regulations or rebuild it.

[¶7.]     The Sapienzas appealed, and Liberty Mutual sent the Sapienzas a letter stating it would continue to defend them through the appeal. However, Liberty Mutual stated it would not indemnify the Sapienzas for the costs they incurred in complying with the injunction because it did not believe such costs constituted covered damages under the Sapienzas' policies.

[¶8.]     In *McDowell v. Sapienza*, we affirmed the circuit court's determination that the Sapienzas constructed their home in violation of the administrative rules governing the height of new construction within historic districts. 2018 S.D. 1, ¶ 22, 906 N.W.2d 399, 406. We also affirmed the court's decision to grant injunctive relief. *Id.* ¶ 31, 906 N.W.2d at 408–09. In regard to the property damage suffered by the McDowells, we noted that the various types of harm recognized by the circuit court "are often not rectified by pecuniary compensation." *Id.* ¶ 24, 906 N.W.2d at 407.

[¶9.]     After the case was remitted, the circuit court ordered the Sapienzas to submit an application to the Sioux Falls Board of Historic Preservation to cure and remedy the violations of the historic district regulations in accord with the court's original decision. The court's order further provided that in the event their revised application was not approved, the court would "exercise all remedies available consistent with the judgment of the court." After the Board denied the Sapienzas' application, the circuit court issued a writ of execution ordering the Minnehaha County Sheriff to remove the Sapienzas' home if the same was not removed within thirty days. On June 7, 2018, the Sapienzas had their home demolished and allegedly incurred $60,000 in complying with the permanent injunction.

[¶10.] In September 2018, the Sapienzas filed suit in federal district court against Liberty Mutual alleging a number of claims, including breach of contract based on Liberty Mutual's failure to provide coverage for the costs the Sapienzas incurred to tear down their newly constructed home. Liberty Mutual filed a motion to dismiss the Sapienzas' complaint for failure to state a claim upon which relief could be granted. The federal district court granted the motion in part, dismissing several claims not implicated here, but denied the motion on the claim alleging a breach of the duty to indemnify. The court determined that there is no controlling South Dakota Supreme Court precedent on the question whether the costs the Sapienzas incurred to comply with the injunction constituted covered "damages" under their insurance policies.[1] Therefore, the federal district court certified the

---

1.      The federal district court noted that the closest authority it could find which might suggest this Court would find coverage was the case of *Taylor v. Imperial Casualty & Indemnity Co.*, 82 S.D. 298, 144 N.W.2d 856 (1966). *See Sapienza v. Liberty Mut. Fire Ins. Co.*, 389 F. Supp. 3d 648, 658–59 (D.S.D. 2019). In *Taylor*, this Court found coverage—under nearly identical insurance contract language—for the costs the insured incurred in complying with an injunction. 82 S.D. at 304, 144 N.W.2d at 859. The circuit court had issued an injunction requiring the insured "to take affirmative action to prevent escaping gasoline from penetrating public thoroughfares of the city and the abutting premises of the telephone company." *Id.* at 302, 144 N.W.2d at 858. The insured expended money in complying with the injunction and sought indemnification from its insurer. The insurer declined coverage, claiming that there were "no damages because of injury to property caused by accident in the original action and hence there was no liability under the terms of the policies." *Id.* While not controlling here because the Court did not examine whether the costs the insured incurred were "damages," the Court did conclude that coverage existed because the injury caused by the insured's negligence was an accident. *Id.* at 304, 144 N.W.2d at 859.

following question to this Court:[2]

> **Do the costs incurred by the Sapienzas to comply with the injunction constitute covered "damages" under the Policies such that Liberty Mutual must indemnify the Sapienzas for these costs?**

## Analysis and Decision

[¶11.]    "Technically, this Court does not sit as an appellate court in this case as the matter came to us as a certified question from the United States District Court for the District of South Dakota. Nevertheless, we employ the same legal standards for this analysis that we use when reviewing appellate cases." *In re Certification of a Question of Law from United States District Court, District of South Dakota, Southern Division*, 2010 S.D. 16, ¶ 6 n.1, 779 N.W.2d 158, 161 n.1 (quoting *Unruh v. Davison Cnty.*, 2008 S.D. 9, ¶ 5, 744 N.W.2d 839, 841–42). The certified question requires us to determine the scope of coverage in the insurance policy provisions at issue. "The interpretation of a contract is a question of law." *State Farm Fire & Cas. Co. v. Harbert*, 2007 S.D. 107, ¶ 17, 741 N.W.2d 228, 234.

[¶12.]    We begin with the relevant language of the policies at issue. The Sapienzas' Homeowners Policy provides:

> **COVERAGE E – Personal Liability**
>
> If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:
>
> 1.    Pay up to our limit of liability for the damages for which the "insured" is legally liable. Damages include prejudgment interest awarded against the "insured"[.]

---

2.    "The Supreme Court may answer questions of law certified to it by the Supreme Court of the United States, a court of appeals of the United States, or a United States district court[.]" SDCL 15-24A-1.

The Homeowners Policy defines "property damage" as "physical injury to, destruction of, or loss of use of tangible property."  The Sapienzas' Personal Liability Policy similarly provides:

> **COVERAGE – PERSONAL EXCESS LIABILITY**
>
> We will pay all sums in excess of the **retained limit** and up to our limit of liability for damages because of **personal injury** or **property damage** to which this policy applies and for which the **insured** is legally liable.

Relevant here, the policy defines "property damage" as "injury to or destruction of tangible property[.]"

[¶13.]     Neither policy at issue defines the term "damages" or the phrase "legally liable."  According to the Sapienzas, the plain and ordinary meaning of the term "damages" is unambiguous and "encompasses both money paid to compensate for harm as well as any expenses, costs, charges, or loss incurred to remedy a harm."  They direct this Court to dictionary definitions to support their contention that the meaning of "damages" "broadly includes any losses, harms, expenses, or costs caused by a specific injury and extends beyond the technical definition of legal damages."  They further assert that the phrase "legally liable" does not in either policy distinguish between an insured's legal obligation to pay money to a third party and a legal obligation incurred in conjunction with an equitable remedy imposed by a court.  Therefore, the Sapienzas ask this Court to adopt the analysis of other courts that have rejected a technical legal definition of the term damages, which draws a distinction between monetary and injunctive relief.  These courts have instead concluded that "damages" includes "any economic outlay compelled by law to rectify or mitigate damage caused by the insured's acts or omissions."  *See*

*Minnesota Mining and Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 181–82 (Minn. 1990). Alternatively, the Sapienzas contend that the term "damages" is ambiguous because, to the extent there are other potential definitions of the term, there is at least a genuine uncertainty whether the term is limited to only money damages paid to a third party.

[¶14.] In response, Liberty Mutual asserts that the nature of liability insurance contemplates an obligation to pay the damages to another party for which the insured is legally liable. It then argues that because there were no damages awarded to the McDowells and the court instead required the Sapienzas to modify or tear down their own home, the Sapienzas did not become legally liable for damages to the McDowells because of property damage. According to Liberty Mutual, the circumstances here are unlike the environmental cleanup cases wherein courts have interpreted "damages" to include costs incurred to comply with injunctive relief. It then directs this Court to other cases holding that the plain and ordinary meaning of the term "damages" does not include such costs. Amici curiae similarly claim that the term "damages" means only "compensatory damages a court awards for bodily injury or property damage to third parties."[3]

[¶15.] It is well settled that "the scope of coverage of an insurance policy is determined from the contractual intent and the objectives of the parties as expressed in the contract." *Ass Kickin Ranch, LLC v. N. Star Mut. Ins. Co.*, 2012

---

3. The Complex Insurance Claims Litigation Association and the National Association of Mutual Insurance Companies appeared as amici curiae by leave of court and filed a consolidated brief. *See* SDCL 15-26A-74 (stating the procedure for appearing as amicus curiae).

S.D. 73, ¶ 9, 822 N.W.2d 724, 727 (quoting *Saint Paul Fire & Marine Ins. Co. v. Schilling*, 520 N.W.2d 884, 887 (S.D. 1994)).

> Further, a court may not seek out a strained or unusual meaning for the benefit of the insured. Instead, an insurance contract's language must be construed according to its plain and ordinary meaning and a court cannot make a forced construction or a new contract for the parties. Essentially, this means that when the terms of an insurance policy are unambiguous, these terms cannot be enlarged or diminished by judicial construction.

*Hanson Farm Mut. Ins. Co. of S.D. v. Degen*, 2013 S.D. 29, ¶ 17, 829 N.W.2d 474, 478 (citation omitted).

[¶16.]     While Liberty Mutual proposes a narrow definition of its policy language, it did not, in either policy, include any language putting insureds on notice that the term "damages" only includes a monetary *award* a court orders an insured to pay a third-party claimant. Notably, the policy provisions in many of the cases Liberty Mutual relies upon to support its limited definition of damages contained more narrow language that is not present in Liberty Mutual's policies. These other provisions are more precise and state that an insurer is obligated to pay all sums which the insured becomes "legally obligated to pay *as* damages." *E.g.*, *Elec. Motor & Contracting Co., Inc. v. Travelers Indem. Co. of Am.*, 235 F. Supp. 3d 781, 788 (E.D. Va. 2017) (emphasis added). In contrast, Liberty Mutual's policies refer to the insurer's obligation to pay for the damages "*for which* the 'insured' is held legally liable." (Emphasis added.) Thus, Liberty Mutual's policy provisions conveys a more expansive meaning, particularly when read by an ordinary homeowner purchasing liability coverage.

[¶17.] Importantly, although the dissent would read into the coverage provisions the restriction that Liberty Mutual only agreed to pay the *third party* who made the claim for property damage, *see supra* Dissent ¶ 33, it is well settled that this Court can neither add language to nor rewrite the insurance contract; and here, the provisions at issue contain no language supporting such a limited definition of the term "damages." *Swenson v. Auto Owners Ins. Co.*, 2013 S.D. 38, ¶ 18, 831 N.W.2d 402, 409. As the Minnesota Supreme Court explained, "If a narrow, technical definition of the term 'damages' was intended by the insurance companies, it was their duty to make that intention clear." *Minnesota Mining*, 457 N.W.2d at 181. This is because "a 'technical' interpretation of the term 'damages,' which draws a distinction between actions at law and in equity, is within the understanding of individuals trained in the law" but would not be plainly understood from the standpoint of insureds without such training. *Id.* at 180. The court further noted that "[t]he utility of the policy would be seriously called into question if coverage is permitted to hinge on such a fortuitous event as whether a plaintiff bringing an action against the insured has framed his complaint in equity rather than in law." *Id.* at 181. Similarly, the New Hampshire Supreme Court has stated, "If insurance carriers wish to limit coverage to non-injunctive, non-restitutionary costs, they are free to do so in plain, intelligible language." *Coakley v. Main Bonding and Cas. Co.*, 618 A.2d 777, 785 (N.H. 1992). The Iowa Supreme Court likewise noted that "[w]hen words are left undefined in a policy we do not give them a technical meaning" or "the meaning only a specialist or expert would understand." *A.Y. McDonald Indus. v. Ins. Co. of N. Am.*, 475 N.W.2d 607, 619 (Iowa 1991).

[¶18.]     When interpreting language that is not defined in an insurance policy, we often look to dictionary definitions. *See Ass Kickin Ranch*, 2012 S.D. 73, ¶ 12, 822 N.W.2d at 728 (noting it is appropriate to rely on dictionary definitions when a term is not defined). The dictionary definition relied upon by several other courts applying a plain and ordinary meaning analysis to define the term "damages" is "the estimated reparation in money for detriment or injury sustained: compensation *or satisfaction imposed by law* for a wrong or injury caused by a violation of a legal right."[4] *Webster's Third New International Dictionary* 571 (Unabridged ed. 2002) (emphasis added); *see A.Y. McDonald Indus.*, 475 N.W.2d at 619 (applying the dictionary definition from Webster's Third New International Dictionary). Even Black's Law Dictionary, which generally defines "damages" as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury[,]" proceeds to identify many types of "damages," not all of which are confined to a sum of money representing the value of the loss incurred by an injured party. For example, the term "irreparable damages" is defined as "[d]amages that cannot be easily ascertained because there is no fixed pecuniary standard of measurement, e.g., damages for a repeated public nuisance." *Black's Law Dictionary* (11th ed. 2019).

---

4.     The dissent seems to agree that a standard dictionary definition could be used in interpreting the plain and ordinary meaning of the term "damages." *See supra* Dissent ¶ 34. However, the dissent's conclusion that the term "damages" cannot "mean anything other than paying money to a third-party claimant alleging damage" ignores the standard definition most applicable to the facts here: the "satisfaction imposed by law for a wrong or injury caused in violation of a legal right." *See Webster's Third New International Dictionary* 571 (Unabridged ed. 2002); *supra* Dissent ¶ 37. "Satisfaction" is defined in the legal context as "[t]he giving of something with the intention . . . that it is to extinguish some existing legal or moral obligation[.]" *Black's Law Dictionary* (11th ed. 2019).

-11-

"Consequential damages," a term employed by the courts finding coverage in the cases discussed below, is defined as "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act." *Id.*

[¶19.] Because these definitions are broader and more inclusive than the narrower one asserted by Liberty Mutual (but not included in its policy provisions), the above definitions support a conclusion that the plain and ordinary meaning of the term "damages" includes the costs the Sapienzas incurred in complying with the injunction. At the very least, the meaning of the term "damages" is ambiguous. Whether policy language is ambiguous is a question of law we determine de novo.[5] *Ass Kickin Ranch*, 2012 S.D. 73, ¶ 7, 822 N.W.2d at 726. Ambiguity exists "[i]f, after examining the plain meaning of the whole policy, there is a 'genuine uncertainty as to which of two or more meanings is correct[.]'" *Larimer v. Am. Fam. Mut. Ins. Co.*, 2019 S.D. 21, ¶ 9, 926 N.W.2d 472, 475 (quoting *Cornelius v. Nat'l Cas. Co.*, 2012 S.D. 29, ¶ 6, 813 N.W.2d 167, 169). When a policy is ambiguous, we adopt the interpretation most favorable to the insured. *Ass Kickin Ranch*, 2012 S.D. 73, ¶ 9, 822 N.W.2d at 727 (citation omitted).

[¶20.] Here, the term "damages" is fairly susceptible to more than one interpretation as evinced by the fact that there is no prevailing definition of "damages" that excludes all forms of injunctive relief despite extensive litigation across the nation on this question. The dissent's suggestion that "an average and reasonable person would surely understand" that the phrase "damages for which

---

5. While the dissent notes that the parties' primary arguments do not assert ambiguity, this Court—not the parties—determines whether an insurance contract is ambiguous.

the 'insured' is legally liable" means only money paid to the third party alleging

damage, *see supra* Dissent ¶ 37, ignores the fact that many courts have concluded

otherwise when interpreting similar insurance policy provisions, even those with

the arguably narrower provisions. *See, e.g., A.Y. McDonald Indus.*, 475 N.W.2d at

615–16 (citing cases interpreting policy provisions providing coverage for all sums

an insured becomes legally obligated *to pay as damages* and noting that nearly all

state appellate courts considering the question posed here in the context of remedial

and injunctive costs have found coverage). As this Court has indicated, when courts

have considered the issue and the decisions reflect that a word has different

meanings, there is no precise meaning and the term is "sufficiently ambiguous[.]"

*See Roden v. General Cas. Co. of Wis.*, 2003 S.D. 130, ¶ 13, 671 N.W.2d 622, 626

(citation omitted). As such, we apply a rule of liberal construction and adopt "the

interpretation most favorable to the insured." *Id.* ¶ 10, 671 N.W.2d at 625 (citation

omitted).

[¶21.] Applying this rule of construction here, the language of Liberty

Mutual's coverage provisions could reasonably be interpreted to include the

injunction costs the Sapienzas incurred.[6] Such costs are predicated on their *legal*

*liability* for what would otherwise be assessed as money damages had the court

determined that a monetary payment to the McDowells would have been adequate

---

6.     Contrary to the dissent's concern, acknowledging that Liberty Mutual did not
       define the term "damages" does not "exalt[ ] *any possible* meaning for the
       term[.]" *See supra* Dissent ¶ 47. Rather, when a term in an insurance policy
       is used in a context that implicates more than one possible scenario, we
       adhere to the rule that we cannot add language to a contract that is not
       there.

to remedy the harm. The McDowells brought suit against the Sapienzas seeking multiple forms of relief, including money damages, and there is no question the circuit court ultimately found the Sapienzas "legally liable" for the property damage they caused to the McDowells' home. However, when the court found that a monetary award to the McDowells would be *inadequate* to remedy the harm caused by the Sapienzas, the court necessarily found the Sapienzas legally liable for "irreparable damages"—those for which "there is no fixed pecuniary standard of measurement." *See Black's Law Dictionary* (11th ed. 2019). The court then deemed it necessary to remedy the harm in a different manner—by first ordering the Sapienzas to expend funds to bring their home into compliance with the governing regulations, and when that was not accomplished, the court issued a writ of execution ordering the Sapienzas to remove it altogether.[7]

[¶22.]     Therefore, applying the definition of "damages" that includes not only reparation in money as a form of compensation, but also a "satisfaction imposed by law for a wrong or injury caused by a violation of a legal right," *see Webster's Third New International Dictionary* 571, the costs the Sapienzas incurred to comply with the injunction are covered "damages" under Liberty Mutual's policies. The

---

7. The dissent cites *Magner v. Brinkman* for the well-known proposition that an injunction cannot be ordered when pecuniary damages can afford adequate relief. *See* 2016 S.D. 50, ¶ 21, 883 N.W.2d 74, 83–84 (cited by the Dissent at ¶ 44). However, what remedies are afforded by law (or "mutually exclusive") in a given case is a different question than the one before the Court here— whether Liberty Mutual's policy provisions provide liability coverage for the costs the insured incurs in complying with the remedy ultimately ordered by the court.

Sapienzas paid these costs to "satisfy the wrong or injury" they caused to the McDowells' property—an injury for which they were ultimately held legally liable.

[¶23.]     Liberty Mutual urges this Court to ignore the many cases that have reached a similar conclusion because they involve injunctions ordered in environmental cleanup cases.[8] It notes that courts in these cases have declined to find coverage under similar policy provisions because the "statutory schemes designed for environmental protection have a unique nature that blurs the distinction between monetary compensation and the expenditure of money to comply with a mandatory injunction." *See Gen. Star Indem. Co. v. Lake Bluff Sch. Dist. No. 65*, 819 N.E.2d 784, 792 (Ill. App. Ct. 2004). But as other courts have recognized, even prior to the enactment of environmental cleanup statutes, the common law recognized the cost of restoring property to its original condition as an alternative measure of damages. *See Minn. Mining*, 457 N.W.2d at 183–84. The Iowa court in *A.Y. McDonald Industries* also cited analogous cases that were not

---

8.     The dissent would also ignore the environmental cases despite the fact that the injunction ordered here is factually similar to the type of relief ordered in those cases. The dissent suggests that applying the statutory remedies afforded in environmental cases undermines the traditional common law remedies. *See supra* Dissent ¶ 44. However, the case the dissent relies on to support this proposition addresses coverage for a different type of remedy. In *TJB Companies, Inc. v Maryland Casualty Co.*, the insured built and sold a house to the plaintiffs. 504 N.W.2d 476 (Minn. 1993). After settling caused structural damage to the home, the plaintiffs brought suit for *rescission* of the purchase agreement and, alternatively, requested damages. After arbitration, the insured was ordered to refund the purchase price to the plaintiffs. The insured complied and sought reimbursement from its insurer under a comprehensive general liability policy. The Minnesota Supreme Court held that a policy provision requiring the insurer to pay the sums "the insured becomes legally obligated to pay *as damages*" did not indemnify the insured for a *refund* of monies the insured had paid been on the contract in accord with the rescission order. *Id.* at 477 (emphasis added).

applying environmental cleanup statutes as support for why other types of costs expended by an insured to halt continuing property damage constitute damages even though they were not in the nature of monetary awards to the third-party property owners. 475 N.W.2d at 623; *see Am. Econ. Ins. Co. v. Commons*, 552 P.2d 612 (Or. Ct. App. 1976).[9]

[¶24.] Therefore, we decline to cast aside these environmental cases, which address scenarios that are factually similar to the circumstances here. In fact, the costs incurred in many of these cases parallel the costs incurred by the Sapienzas. Like the injunctions ordered in environmental cases, which required insureds to remediate groundwater contamination or other pollution emanating from their property and causing third-party property damage, the injunction here required the Sapienzas to remediate existing damage to the McDowells' home to restore it to its condition prior to the construction of the Sapienzas' home. In circumstances like these, many courts have found coverage under commercial general liability policies containing language similar to that found in Liberty Mutual's policies.

[¶25.] In *Minnesota Mining*, for example, the court noted that while "[d]amages are typically regarded as the sum awarded to a third person as

---

9. In *Commons*, a fire started on the insureds' property and spread to several adjacent farms and endangered forest land. 552 P.2d at 613. The State used its equipment and personnel to put out the fire and sought to recover its costs from the insureds. The insureds tendered the action to their insurer, who then brought a declaratory action to determine its responsibility under the policy. The Oregon court concluded that the fire suppression costs were recoverable from the insurer. *Id.* The court explained that the language making the insurer "liable for damages 'because of . . . property damage'" covers more than just the "damage done by the fire." *Id.*; *accord Globe Indem. Co. v. California*, 43 Cal. App. 3d. 745, 751 (Cal. Ct. App. 1974) (concluding the same).

compensation for loss or injury[,]" the standard language used in the insurance policy is broad. 457 N.W.2d at 177, 182 (interpreting the phrase "all sums which the insured shall become legally obligated to pay as damages because of . . . property damage"). The court relied on the Webster's dictionary definition cited above and by several other courts finding coverage when holding that "[t]he ordinary understanding of the term 'damages'" includes "consequential damages" such as costs associated with cleaning up contamination. *Id.* at 182; *see also Coakley*, 618 A.2d at 785 (quoting the same dictionary definition and holding that injunctive costs that are remedial in nature are covered, as such costs satisfy the plain and ordinary definition of "damages"—"compensation *or satisfaction imposed by law*" (emphasis added)); *Farmland Indus. Inc. v. Republic Ins. Co.*, 941 S.W.2d 505, 510 (Mo. 1997) (explaining that "[t]he word 'damages' is used to make clear that insurers are obligated to cover both direct and consequential losses because of property damage for which an insured can be held liable, irrespective of whether the claimant itself has sustained property damage").

[¶26.] Further, in *A.Y. McDonald Industries*, the Iowa court rendered a particularly thorough opinion supporting why many of the remedies at issue in the environmental pollution cases are not materially different from the injunction at issue here. *See* 475 N.W.2d at 622–25. The court observed that "[r]esponse or cleanup costs 'are essentially compensatory damages for injury to [government] property.'" *Id.* at 622–23 (alteration in original) (citation omitted) (referring to natural resources like groundwater). These damages, the court explained, are "simply measured in the cost to restore them to their original state." *Id.* at 623

(citing *Ohio v. United States Dep't of the Interior*, 880 F.2d 432, 441–45, 459 (D.C. Cir. 1989) (holding that cost of restoration is the proper measure of "damages" under CERCLA, even if greater than the diminution in value of the damaged property)).

[¶27.]     Finally, it is important to recognize that the nature of the injunctive relief governs whether sums paid for such would be covered under policy provisions of the sort here.  Not all injunctions have the same purpose.  *Compare Reparative Injunction*, *Black's Law Dictionary* (11th ed. 2019) ("requiring the defendant to restore the plaintiff to the position that the plaintiff occupied before the defendant committed a wrong"), *with Preventative Injunction, Black's Law Dictionary* (11th ed. 2019) ("designed to prevent a loss or injury in the future").  As such, costs associated with injunctive relief ordered to prevent property damage that has yet to occur "are not 'damages because of property damage'" and, as a result, may not fall within coverage provisions.  *See A.Y. McDonald Indus.*, 475 N.W.2d at 624.

[¶28.]     Here the circuit court's injunction was clearly reparative and preventative as it was meant to remediate existing and continuing harm to the McDowells' home.  The only way to restore it to its original state was by reconstructing or removing the Sapienzas' home.  Therefore, the measure of "damages" for which the Sapienzas became legally liable because of this property damage was the cost the Sapienzas incurred in complying with the injunction.  For

these reasons, we answer the certified question from the federal district court in the affirmative.[10]

[¶29.]    KERN, Justice, and GILBERTSON, Retired Chief Justice, concur.

[¶30.]    JENSEN, Chief Justice, and SALTER, Justice, dissent.

[¶31.]    MYREN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.


SALTER, Justice (dissenting).

[¶32.]    I would answer the certified question in the negative and hold that the costs incurred by the Sapienzas complying with the injunction in the underlying case are not damages within the meaning of the Liberty Mutual policies. I write to register my dissent and respectfully add my views.

[¶33.]    The coverage in the policies at issue here affords liability protection – not first-party coverage. The textual reference in the Homeowners Policy regarding Liberty Mutual's obligation to "pay . . . for the damages" refers to a promise to pay the third party who made the claim for property damage against the insured for

---

10.    At oral argument, counsel for the Sapienzas clarified that they are also seeking to recover the cost of constructing their non-conforming home as "damages" under the policies at issue. The federal district court noted that if the Sapienzas were in fact seeking to recover such costs, this issue would seem appropriate to address on certification. *Sapienza*, 389 F. Supp. 3d at 659 n.2. While this additional issue was not ultimately incorporated in the certified question, it is clear that the policy provisions at issue would not cover such costs. The Sapienzas were not held legally liable for the *construction* costs of their home, nor were these costs incurred *because of property damage* caused to a third party.

which the insured is found legally liable.[11]  In other words, the intended recipient of "*the* damages" is the same third party who made the claim "*against the insured* for damages because of . . . property damage" – not the insureds themselves.[12]  Indeed, resolving the certified question here has less to do with settling on a definition of damages in the first instance and turns more on correctly ordering the syntax of the insuring agreement.  On this basis alone, I believe the Court should answer the certified question in the negative.

[¶34.]        Nevertheless, in their effort to obtain liability coverage, the Sapienzas offer what they believe to be an array of alternative definitions for "damages" in an apparent effort to render hopeless any construction of the term.  However, using a standard definition of "damages" as the "estimated reparation in money for detriment or injury sustained; compensation or satisfaction imposed by law for a wrong or injury[,]" Webster's Third New International Dictionary 571, is simply the first step in the correct application of our plain and ordinary meaning standard.

---

11.    The Personal Liability Policy affords similar liability coverage for third-party claims "for which the insured is legally liable."

12.    The Sapienzas argue that the language of the policies providing that Liberty Mutual must "[p]ay . . . up to our limit" and "pay all sums" does not expressly require the payment of damages only to third-party claimants.  True enough insofar as the argument goes, but our obligation to construe an insurance policy requires us to examine more than isolated phrases and instead interpret the provision at issue as a whole. *See Culhane v. W. Nat. Mut. Ins. Co.*, 2005 S.D. 97, ¶ 19, 704 N.W.2d 287, 293 (*citing Nelson v. Farmers Mut. Ins. Co. of Neb.*, 2004 S.D. 86, ¶ 11, 684 N.W.2d 74, 77).  Guided by this principle here, Liberty Mutual's obligation to pay "the damages" logically applies only to the third party who made the claim for "damages" against the insured.

[¶35.]　　Indeed, the fact that an insurance contract does not define a term does not provide a license to simply list varied definitions and promptly conclude that the term's apparent breadth must necessarily yield an interpretation favoring the insured or, at a minimum, vexing ambiguity. Our cases require a better, more-practical test under which we train our attention to how an "ordinary, average and reasonable person would understand" the contractual language – not any conceivable definition of a contested term. *Finck v. Nw. Sch. Dist. No. 52-3*, 417 N.W.2d 875, 877 (S.D. 1988); *see also Grandpre v. Nw. Nat. Life Ins. Co.*, 261 N.W.2d 804, 807 (S.D. 1977) (applying ordinary person standard to plain and ordinary meaning inquiry). Only where "the contract language cannot be construed . . . according to its plain and ordinary meaning" or is ambiguous[13] may we indulge the rule of liberal construction in favor of the insured. *Klatt v. Cont'l Ins. Co.*, 409 N.W.2d 366, 369 (S.D. 1987).

[¶36.]　　Often, as in this case, the use of a disputed term does not arise in a boundless void, but rather occurs in a specific context that can assist in determining its plain an ordinary meaning. Reading the word "damages" in the entire context of policies here demonstrates that there is no ambiguity in the policy. We relied upon a similar analysis in *Hanson Farm Mutual Insurance Co. v. Degen*, where we considered "the context of the [insurance] policy" to determine the plain and ordinary meaning of the term "care" in a household exclusion barring liability coverage for children "in [the insured's] care[.]" 2013 S.D. 29, ¶ 20, 829 N.W.2d 474, 479. Examining how an undefined term is used in an insurance policy does not

---

13.　　In their primary arguments, neither party alleges the policies are ambiguous.

signal a departure from our plain and ordinary meaning standard or suggest that any resulting definition will reflect a technical, insurance-industry meaning. Instead, looking to the reality of how a particular term is used is simply a prudent means of ascertaining how an ordinary, average, and reasonable person would understand it.

[¶37.] Here, then, we should resist any impulse to reflexively conclude that the varied dictionary definitions of "damages" range so far that their breadth alone resolves the certified question in the Sapienzas' favor. The term's use comes conspicuously in two insurance contracts, something an average and reasonable person would surely understand to have legal significance in defining the rights and responsibilities of the insured and the insurer. Given the circumstances, I cannot accept the view that a reasonable person in the role of a party to an insurance contract featuring *liability coverage* would understand an insurer's obligation to pay "damages . . . for which the 'insured' is legally liable" to mean anything other than paying money to a third-party claimant alleging damage.

[¶38.] However, given the particular nature of the relief ordered by the circuit court in *Sapienza*, even the Sapienzas' attempt to broaden the concept of damages as compensation for a legal wrong is not helpful to their claim. The mandatory injunction entered by the circuit court in *Sapienza* did *not* require the Sapienzas to compensate the McDowells or satisfy their property damage claims. Rather, it required *only* that the Sapienzas "bring their residence into compliance with the Administrative Rules of South Dakota 24:52:07:04" and similar federal

regulations "or rebuild it." [14]  Indeed, the outcome of *Sapienza* was no different than it would have been in a successful enforcement action by municipal authorities seeking to compel the Sapienzas' compliance with the regulations governing the construction of homes in historic districts, without the prospect of property damage.

[¶39.]     It is true that the Sapienzas' non-conforming house prompted the McDowells' claims for property damage.  The McDowells could not use their fireplace due to the proximity of the Sapienzas' house to their chimney, and the McDowells reported diminished sunlight in their home.  As it turned out though, the McDowells' alternative claim for "*damages* because of . . . [their] property damage" never came to pass.  The circuit court found the harm caused by the Sapienzas' non-conforming house was "irreparable and unable to be cured by monetary compensation."[15]  We agreed and affirmed the circuit court's determination:

> [T]he injunction was also based on the harm to McKennan Park itself.  The [circuit] court found that McKennan Park's "historic context is forever undermined."  This type of intangible harm to McKennan Park would not be remedied by the payment of money to McDowells.  Even if McDowells could be fully compensated for their individual loss, pecuniary compensation

---

14.    The text of ARSD 24:52:07:04 includes eleven subsections governing standards for new construction in historic districts, including compatibility of design, height, width, proportion, rhythm and scale, and setting.

15.    Merely seeking money damages may have been sufficient to trigger Liberty Mutual's duty to defend, but the narrower obligation to indemnify at issue here arises only if the third party claiming property damage receives an award of damages. *See Geidel v. De Smet Farm Mut. Ins. Co. of S.D.*, 2019 S.D. 20, ¶¶ 8-9, 926 N.W.2d 478, 481 (holding that a liability insurer's broader duty to defend is determined by the allegations in the claim against the insured).

> would not remedy McKennan Park's continuing and long-term loss of its historic character.

*Sapienza*, 2018 S.D. 1, ¶ 26, 906 N.W.2d at 407.

[¶40.] Of course, we now know that the Sapienzas complied with the injunction by razing their house which, in turn, had the effect of removing the impediment to the McDowells' fireplace and allowed more sunlight back into their home. But that result was not required or assured by the circuit court's mandatory injunction, which directed only compliance with regulations governing construction in historic districts and was not specifically crafted to remedy the McDowells' property damage claims. The plain fact that the McDowells' concerns were ultimately alleviated does not mean that the Sapienzas were ordered to remedy the McDowells' property damage claims relating to the lost use of their fireplace and diminished sunlight.

[¶41.] In fact, the fireplace claim was actually unconnected to compliance with ARSD 24:52:07:04. Rather, it implicated a municipally-adopted provision of the International Residential Code (IRC) prescribing a minimum lateral clearance standard for chimneys. *Sapienza*, 2018 S.D. 1, ¶ 13, 906 N.W.2d at 404. The circuit court determined that the IRC's chimney rule had the effect of increasing the setback requirement provided in a separate city ordinance. *Id.* However, in a perhaps less conspicuous portion of our *Sapienza* opinion, we held that the Sapienzas were *not liable* for violating the setback standard when they located their house in close proximity to the McDowell property line:

> By its express terms, § R1003.9 regulates the height of chimneys on a structure, not the siting of structures on other properties. Although Sapienzas' new home may have caused McDowells' home to fall out of compliance, Sapienzas' home was not sited in

> violation of the chimney regulation. We reverse the circuit
> court's contrary legal conclusion.

*Id.* ¶ 14.

[¶42.]     In any event, the idea of abating a harm by ordering compliance with the law as an alternative to compensation illustrates a critical remedies concept that renders inapposite the cases dealing with injunctions requiring payment of environmental response costs upon which the Sapienzas and the Court rely. These environmental cleanup cases feature broad and specialized statutory authority designed to allow government regulators significant flexibility to determine enforcement measures among alternative remedies. *See Outboard Marine Co. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1216 (1992) (noting that "CERCLA was designed to allow governmental agencies flexibility . . . [by] allow[ing] the agencies to exercise discretion in choosing from several forms of relief including mandatory injunctions, response or cleanup costs, and damages for injury to natural resources"). For instance, federal regulators enforcing the CERCLA can opt to clean up a hazardous waste site themselves and pursue reimbursement from the responsible parties or "seek injunctive relief to require the responsible parties to clean up the site." *A.Y. McDonald Indus.*, 475 N.W.2d at 614.

[¶43.]     The response costs necessary for contaminant removal and remediation may very well be the same whether they are undertaken by the responsible party coerced by an injunction or whether the costs are later assessed by government regulators who undertook the response effort unilaterally. *See id.* at 616 (collecting cases that hold not allowing liability coverage for environmental response costs would "make coverage depend on the 'mere fortuity' of which

alternatives – injunction, reimbursement, or damages to natural resources – the EPA chooses in enforcing CERCLA"). But this is not true in the traditional remedies context, such as the one that was at issue in *Sapienza*, where the inadequacy of pecuniary compensation effectively made money damages and injunctive relief mutually exclusive – not interchangeable or complementary – remedies. *See* 2018 S.D. 1, ¶ 26, 906 N.W.2d at 407.

[¶44.] Accordingly, the Sapienzas' argument that "the Circuit Court could have awarded compensatory damages . . . or ordered the injunctive relief actually issued" is fundamentally at odds with our decision in *Sapienza* where we held that "pecuniary compensation would *not* afford adequate relief." *Id.* ¶ 24 (emphasis added); *see also Magner v. Brinkman*, 2016 S.D. 50, ¶ 21, 883 N.W.2d 74, 83-84 (vacating an injunction requiring defendants to pay plaintiffs a specific sum of money for drainage mitigation because the injunction was "no more than a simple money judgment for future damages" that "undermine[d] the conclusion that the [plaintiffs'] harm was irreparable"). Applying the statutory remedies concepts implicated in environmental cleanup cases to the common law undermines these remedies principles. *See TJB Companies, Inc. v. Maryland Cas. Co.*, 504 N.W.2d 476, 477 (Minn. 1993) (rejecting an intermediate appellate court's conclusion that an insured's cost of complying with an order of rescission was a "substitute for or the near equivalent" of damages that triggered a liability insurer's duty to indemnify).

[¶45.] Beyond this, applying the rule the Sapienzas and the Court suggest alters the Liberty Mutual liability insurance agreements, straining the text of the

policies well beyond their limits and effectively converting the liability provisions into something more akin to first-party insurance by requiring ostensible liability coverage for property owned by the insured. *See* 12 Couch on Insurance § 172:26 (3d ed. 2020) (observing that "[l]iability insurance, in contrast [to first-party property insurance], covers the liability of the insured for property damage to property that is not owned by, or in the care or custody of, the insured"). Our cases do not permit courts to modify private insurance agreements in this way. *See Grandpre*, 261 N.W.2d at 807 (holding that a court's interpretation of an otherwise undefined term in an insurance policy cannot create a new insurance contract between the insured and the insurer).

[¶46.]     To answer the certified question presented, it is necessary only to understand that the Sapienzas' policies contemplate "damages" that are sought "because of . . . property damage" necessarily sustained by the third party making the claim against the insured. Though the Sapienzas may well feel "damaged" in the colloquial sense that they incurred the cost of razing their home, this sort of injury sustained *by the insured* is not compensable under the liability provisions of the policies.

[¶47.]     Finally, I am concerned that the Court's holding today could have a broader and more enduring impact beyond the result in this case. The Court reached its decision by effectively holding Liberty Mutual responsible for not defining the term damages – not by considering, in any serious way, its plain and ordinary meaning as used in these insurance policies. In my view, this exalts *any possible* meaning for an undefined term, over its plain and ordinary one.

#29000

[¶48.]     JENSEN, Chief Justice, joins this writing.