#29291-r-SRJ
**2021 S.D. 63**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

THE PEOPLE OF THE STATE OF SOUTH DAKOTA
IN THE INTEREST OF D.S., CHILD, AND CONCERNING
A.K. AND A.S., RESPONDENTS,

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE MATTHEW M. BROWN
Judge

\* \* \* \*

JOANNA LAWLER of
Pennington County Public
   Defender's Office
Rapid City, South Dakota

          Attorneys for child and
          appellant, D.S.


JASON R. RAVNSBORG
Attorney General

JONATHAN VAN PATTEN
Assistant Attorney General
Pierre, South Dakota

          Attorneys for petitioner and
          appellee, State of South Dakota.

\* \* \* \*

ARGUED
MARCH 23, 2021
OPINION FILED **11/03/21**

#29291

JENSEN, Chief Justice

[¶1.] Seventeen-year-old D.S. was adjudicated of first-degree rape. Prior to the dispositional hearing, a psychologist conducted a psychosexual evaluation of D.S., after which he concluded D.S. had a low risk of recidivism and recommended community-based outpatient treatment. The circuit court committed D.S. to the custody of the Department of Corrections (DOC) pursuant to SDCL 26-8C-7. D.S. appeals, arguing the circuit court erred by failing to apply the statutory requirements for DOC placement under SDCL 26-8C-7(10). We reverse and remand.

**Facts and Procedural History**

[¶2.] When D.S. was fifteen years old, his sister (Sister) frequently babysat R.B., a four-year old boy. D.S. went to R.B.'s home to help Sister babysit on July 21, 2018, from approximately 7:30 p.m. to midnight, and on July 25, 2018, from approximately 4:30 p.m. to 10:00 p.m.

[¶3.] On August 5, 2018, R.B. told his mother (Mother) that something happened when D.S. was babysitting. He stated that he and D.S. were hiding in his bedroom, and Sister was in another room, when D.S. "pulled down his pants and made me lick his pee bug." Mother asked R.B. how many times he licked D.S.'s "peepee," and R.B. replied "ten!" R.B. also told her "something to the effect of . . . he had to lick [D.S.]'s penis about a million times." R.B. did not indicate to Mother whether D.S.'s penis went into his mouth.

[¶4.] Mother called the police that day to report the incident. She told law enforcement that R.B. "likes to play pretend, but he is not one to make up stories."

-1-

She also stated that R.B. likes to exaggerate by saying the word "ten," but "he would not have told her ten if he had not actually followed through with the action." Mother claimed that R.B. had never made an accusation of a similar nature before.

[¶5.] Investigator Jesse Fagerland of the Rapid City Police Department interviewed D.S. the next day. D.S. initially denied the allegations. However, after Investigator Fagerland suggested there may have been a "nanny cam" in R.B.'s room that recorded the assault, D.S. admitted that he told R.B. to lick his penis. On the night of the assault, D.S. claimed that R.B. told Sister to "suck a dick," which angered D.S. Later that night, D.S. stated Sister told him to take R.B. to his room. He complied, then unzipped his pants and told R.B. to lick his penis to punish R.B. for his behavior. D.S. said R.B. only licked the tip of his penis and refused to lick more. D.S. also claimed his penis did not go inside of R.B.'s mouth, and he denied being sexually aroused during the assault. Later during the interview, D.S. denied that R.B. had licked his penis at all.

[¶6.] Over a week later, Brandi Tonkel, a lead forensic interviewer at the Child Advocacy Center in Rapid City, interviewed R.B. about the incident. R.B. told Tonkel that D.S. made him suck D.S.'s "pee bug." He described how D.S. pulled his pants and underwear down and showed Tonkel how his "mouth had to open." R.B. also claimed that D.S. moved his "pee bug" inside his mouth, which made him feel sick. He explained his "tummy hurt" and he "cough[ed] a lot" during the assault.

[¶7.] The State filed a juvenile delinquency petition, which charged D.S. with first-degree rape. An adjudicatory hearing was held on December 16, 2019. Investigator Fagerland, R.B. (then age five), Mother, and Tonkel testified for the

State.  Sister testified for the defense.  Sister did not recall that anything unusual happened on either night D.S. helped her babysit.  She confirmed that R.B. would say "suck my dick" and other bad words he learned at school when he misbehaved.  Normally, Sister responded by telling him to stop, telling Mother, or by sending R.B. to his room.  Sister denied that D.S. and R.B. were in R.B.'s bedroom alone together on the nights D.S. was with her.

[¶8.]         During closing arguments, D.S. conceded the State may have made a "case for assault, possibly sexual contact with a minor."  However, D.S. argued there was not sufficient evidence to establish penetration beyond a reasonable doubt under SDCL 22-22-1.[1]  He argued R.B.'s trial testimony that D.S. made him suck his penis was inconsistent with some of R.B.'s prior statements, indicating that R.B. did not understand the difference between "lick" and "suck."  Following the hearing, the court orally entered detailed findings of fact in which it weighed the credibility of R.B.'s testimony with the other evidence presented.  As part of this assessment, the circuit court first laid out the factors it considered when assessing the credibility

---

1.     Rape is an act of sexual penetration accomplished with any person under any of the following circumstances:

> (1) If the victim is less than thirteen years of age; or
> (2) Through the use of force, coercion, or threats of immediate and great bodily harm against the victim or other persons within the victim's presence, accompanied by apparent power of execution; or
> (3) If the victim is incapable, because of physical or mental incapacity, of giving consent to such act; or
> (4) If the victim is incapable of giving consent because of any intoxicating, narcotic, or anesthetic agent or hypnosis; or
> (5) If the victim is thirteen years of age, but less than sixteen years of age, and the perpetrator is at least three years older than the victim.

SDCL 22-22-1.

of a witness's testimony: honesty, memory, suggestibility, and communication ability. The circuit court then discussed the meaning of each factor and explicitly explained how it evaluated R.B.'s testimony and demeanor against each factor. Next, the circuit court discussed how it weighed credibility through factors including the compatibility of the testimony with other evidence in the case, the demeanor of the witness, and whether the testimony "makes sense," when considered with the other evidence in the record. The circuit court addressed counterarguments of counsel and then stated its findings, discussing the reasons for each individual finding at length. At the conclusion of the hearing, the court adjudicated D.S. as a delinquent child for committing first-degree rape under SDCL 22-22-1.[2] The court ordered a social case study and psychosexual evaluation of D.S. prior to the final dispositional hearing.

[¶9.]    Dr. William Moss, Psy. D., completed the psychosexual evaluation, which included interviews and tests to assess D.S.'s social development, intelligence, education, sexual history, mental health, substance use, and likelihood of recidivism. Dr. Moss concluded D.S. had "very few" risk factors for sexual offenses, and did not exhibit "emotional turmoil, poor problem-solving ability, a predisposition to anger and anti-social behavior, . . . inappropriate sexual urges or fantasies," or substance abuse. The report further concluded that D.S. struggled socially, but he had average intelligence, no history of delinquency, and "there was no evidence of [D.S.] being sexually aroused by children, violence or use of force." Based on these factors, Dr. Moss concluded that D.S. had a low risk of recidivism.

---

2.    On appeal, D.S. does not challenge his adjudication of first-degree rape.

[¶10.]	However, Dr. Moss noted that D.S. "has been unable to display remorse for his actions or motivation for a change . . . . [H]is denial of responsibility . . . despite being determined guilty in court" was a risk factor for recidivism. Further, the report stated D.S. "steadfastly denied having committed the crime" for which he was convicted and expressed frustration that nobody believed his side of the story. Although D.S. did not "place direct blame on the victim," Dr. Moss reported that D.S.'s anger at being "wrongly accused and disbelieved by people in authority . . . impede[d] his ability to express sympathy for what the victim has experienced."

[¶11.]	Given D.S.'s low risk of recidivism, Dr. Moss recommended outpatient sex offender treatment. His report noted that outpatient treatment "would afford [D.S.] the support and involvement of his mother . . . and what is available within the community." Dr. Moss's report also recommended increasing D.S.'s involvement in community groups, such as sports teams and church groups, stating that "having a greater number of positive peer influences would help further reduce [D.S.'s] potential for reoffending."

[¶12.]	Court Services Officer Erika Liberty (CSO Liberty) conducted the social case study. She interviewed D.S. and Mother and reviewed Dr. Moss's report and recommendations. D.S. told CSO Liberty that he felt "horrible" for his actions, but CSO Liberty was unsure whether D.S. accepted responsibility because he "did not elaborate on his remorse or how the victim fe[lt]." CSO Liberty also noted that D.S. did not have "any history of physical aggression[,] . . . poor frustration tolerance," or delinquency; and D.S. was willing "to enter into and complete any

services being offered." Further, D.S. had been on pre-adjudication supervision with an ankle monitor for nearly a year without any incident. CSO Liberty agreed that D.S. had a low risk of recidivism. She also agreed with Dr. Moss's recommendation for outpatient treatment and recommended six months of supervised probation.

[¶13.] A dispositional hearing was held on February 13, 2020. The State offered a letter from Mother expressing frustration that D.S. had not accepted responsibility for his actions. In light of the "heinous sexual act" D.S. committed, Mother asked the court to place D.S. in jail until he was twenty-one-years-old. The State asked the court to reject the recommendations of Dr. Moss and CSO Liberty and commit D.S. to the DOC. The State argued that D.S. "remain[ed] a high risk for reoffending" because he denied responsibility for the offense and did not appear to show remorse. Further, the State claimed D.S.'s lack of prior delinquency "does not minimize the seriousness of his actions or the impact that its had on the victim or the victim's family." It claimed DOC supervision would protect the community while D.S. was in treatment, and the "best way" to treat D.S. was also in the "structured environment" of DOC custody.

[¶14.] D.S. responded that he admitted to a sexual contact offense but denied that he committed an act of penetration under SDCL 22-22-1. D.S. asked the court to adopt the recommendation of CSO Liberty and argued there was no evidence or testimony that refuted Dr. Moss's recommendation for outpatient treatment. D.S. also argued DOC placement was not the least restrictive alternative because he had

been on ankle bracelet monitoring for 216 days without any issues and had been cooperative throughout the investigation and court proceedings.

[¶15.] The court stated that "[r]ehabilitation and the best interest of the minor child are the primary goals in this case, but the Court cannot ignore the gravity of the offense and must also consider community safety and the impact on the victim." In considering the gravity of the offense, the court stated, "[t]here are few, if any, crimes that are committed worse than the type of offense that underlies this case." The court held the "aggravating factors" of the offense were the age difference between D.S. and R.B., D.S.'s "asserted rationale for the offense, . . . the effect of the offense on the victim," and "the egregious nature of the offense." Mitigating factors were D.S.'s "very low risk of recidivism," as found by Dr. Moss, and D.S.'s lack of prior delinquency. The court also observed that D.S. had been on electronic monitoring with "absolutely no problems . . . for a long time."

[¶16.] In announcing its disposition, the court stated: "[i]n considering the testimony, the psychosexual evaluation, the social case study, and both the mitigating and aggravating factors in this matter, . . . the [c]ourt believes that you would be best served, [and] the interest that underlie this [c]ourt's rationale would be best reflected, with the disposition of a placement in the Department of Corrections." The court did not address whether the recommendations before it for community supervision and outpatient treatment were viable alternatives to DOC custody or whether commitment to the DOC was the least restrictive alternative in D.S.'s best interest.

[¶17.]     The day after the dispositional hearing, the court entered written findings of fact and conclusions of law stating there were "no other viable alternatives in the community" to DOC placement and commitment to the DOC "was the least restrictive alternative." The court did not provide any explanation or analysis for these findings. D.S. appeals and raises the single issue of whether the court's disposition was an abuse of discretion.

## Analysis and Decision

[¶18.]     The State initially asks this Court to dismiss the case as moot. On February 25, 2020, the DOC placed D.S. at an inpatient treatment center in Minnesota. D.S. was successfully discharged from the treatment center in June 2020 and was in aftercare under DOC supervision at the time the parties submitted their briefs. The State argues the case is moot because the DOC is likely to release D.S. from supervision by the time the case is heard. D.S. responds that it is unknown when he will be released from DOC aftercare. Further, even if he is released before the case is resolved, D.S. argues this Court should consider his claim under the public interest exception to the mootness doctrine.

[¶19.]     The record does not show that D.S. has been discharged from DOC supervision. Until D.S. is discharged or turns twenty-one-years-old, he remains under the jurisdiction of the DOC. *See* SDCL 26-11A-20 (discussing grounds for discharging a juvenile from the DOC and providing that "[n]o adjudicated juvenile may remain within the jurisdiction of the Department of Corrections beyond the age of twenty-one years"). We conclude that D.S.'s challenge to his disposition is a "real controversy" while he remains under the jurisdiction of the DOC. *See Sullivan v.*

*Sullivan*, 2009 S.D. 27, ¶ 11, 764 N.W.2d 895, 899 (stating "an appeal will be dismissed as moot . . . [when] there has been a change of circumstances or the occurrence of an event by which the actual controversy ceases").

[¶20.]     "In reviewing court orders in a juvenile proceeding, we consider whether the trial court abused its discretion or otherwise committed an error of law requiring reversal." *People in Int. of Y.C.*, 1997 S.D. 126, ¶ 4, 570 N.W.2d 36, 37. "A court abuses its discretion when it makes 'a fundamental error of judgment, a choice outside the reasonable range of permissible choices, a decision . . . [that] on full consideration, is arbitrary or unreasonable.'" *Weber v. Rains*, 2019 S.D. 53, ¶ 22, 933 N.W.2d 471, 477 (citation omitted). We have also held that "[a] circuit court abuses its discretion when it makes an error of law." *Blair-Arch v. Arch*, 2014 S.D. 94, ¶ 10, 857 N.W.2d 874, 877 (citation omitted). "[T]he [circuit] court's factual findings will not be overturned unless they are clearly erroneous." *State v. Labine*, 2007 S.D. 48, ¶ 18, 733 N.W.2d 265, 270. Here, the finding that no viable alternative exists and that DOC commitment is the least restrictive alternative are findings of fact subject to clear error review. The circuit court's decision under SDCL 26-8C-7(10) to commit a child to the DOC is an application of law subject to abuse of discretion review. *See Erdahl v. Groff*, 1998 S.D. 28, ¶ 15, 576 N.W.2d 15, 18 ("Where an ultimate conclusion can be arrived at only by applying a rule of law, the result is a 'conclusion of law.'" (quoting *Hartpence v. Youth Forestry Camp*, 325 N.W.2d 292, 296 (S.D. 1982))).

[¶21.]     Juvenile courts are "theoretically engaged in determining the needs of the child and of society rather than adjudicating criminal conduct. The[ir]

objectives are to provide measures of guidance and rehabilitation for the child and protection for society, not to fix criminal responsibility, guilt and punishment." *Kent v. United States*, 383 U.S. 541, 554, 86 S. Ct. 1045, 1054, 16 L. Ed. 2d 84 (1966). More recently, the Supreme Court has recognized that science on adolescent brain development supports a different penological approach to juveniles than adults. *See Graham v. Fla.*, 560 U.S. 48, 68–69, 130 S. Ct. 2011, 2026–27, 176 L. Ed. 2d 825 (2010). "[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds . . . . Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults." *Id.* at 68, 130 S. Ct. at 2026 (quoting *Roper v. Simmons*, 543 U.S. 551, 570, 125 S. Ct. 1183, 1195, 161 L. Ed. 2d 1 (2005)).

[¶22.]     In juvenile proceedings, we have long held that a court must consider and balance the interest of rehabilitation for the juvenile and the interest of public safety. "The purpose of juvenile court proceedings is not to punish but rather to rehabilitate and correct a juvenile's behavior so as to avoid future confrontations with the law." *In re S.K.*, 1999 S.D. 7, ¶ 11, 587 N.W.2d 740, 742 (quoting *State v. Jones*, 521 N.W.2d 662, 667 (S.D. 1994)). However, "[s]ociety must [also] be protected from violent crime and the agony of its effects . . . . Protection of society must be sought whether accomplished through rehabilitation or incarceration. Obviously[,] rehabilitation is the preferred route in dealing with juveniles, but it cannot be accomplished in all cases." *People in Int. of Y.C.*, 1998 S.D. 76, ¶ 43, 581 N.W.2d 483, 490.

[¶23.] In 2015, the Legislature enacted the Juvenile Justice Public Safety Improvement Act (JJPSIA) to improve juvenile rehabilitative outcomes and increase public safety. *See* S.B. 73, 90th Leg., Reg. Sess. (S.D. 2015). Among other changes, the legislation modified the requirements for DOC commitments of juveniles adjudicated of delinquent offenses under SDCL 26-8C-7. *Id.* For a juvenile adjudicated of a delinquent offense, the JJPSIA maintained the standard that "the court shall enter a decree of disposition according to the least restrictive alternative available in keeping with the best interests of the child." SDCL 26-8C-7.

[¶24.] However, the JJPSIA imposed additional requirements that limit a court's discretion to commit a juvenile to the DOC. First, the juvenile must be adjudicated for a qualifying offense, which includes crimes of violence, sex offenses, and other offenses specifically enumerated in the statute.[3] SDCL 26-8C-7(10)(b)(i). Additionally, "[t]he court *may only commit a child to the* [*DOC*] if the judge finds that: (a) [n]o viable alternative exists; and (b) [t]he [DOC] is the least restrictive alternative . . . ." SDCL 26-8C-7(10) (emphasis added).

[¶25.] D.S. acknowledges that his adjudication for first-degree rape was a qualifying offense under SDCL 26-8C-7(10). However, he argues the other two requirements for DOC placement were not satisfied and the circuit court failed to address either requirement in its oral dispositional ruling. D.S. claims that outpatient treatment was a viable alternative because the court was not presented

---

3. SDCL 26-8C-7(10)(b)(ii), which is not relevant to this case, also allows for a DOC commitment in certain instances in which a child has not been adjudicated of a qualifying offense under SDCL 26-8C-7(10)(b)(i).

with "any evidence or argument . . . that [it] would be unsuccessful." He also claims the Juvenile Intensive Probation Program was another viable alternative that the circuit court failed to consider. Further, D.S. argues there was no evidence that commitment to the DOC was the least restrictive alternative in his best interest. Relying on Dr. Moss's conclusion that he would benefit from support in the community and the involvement of his mother in treatment, D.S. argues that the court's disposition threatened to hinder his rehabilitation by removing him from his family and the community.

[¶26.] D.S. claims the circuit court's written findings of fact and conclusions of law, prepared after the hearing, were unfounded and insufficient to satisfy the statute. He also alleges the court improperly considered "the role of punishment" in his case. The State responds that the court correctly found outpatient treatment was insufficient to address D.S.'s rehabilitative needs and protect the community, and the court's written conclusions of law satisfied the requirements of SDCL 26-8C-7(10).

[¶27.] A portion of the circuit court's oral disposition seemed to focus on retributive or punishment interests in reaching a disposition. The court made references to the spectrum of "punishment . . . in the juvenile system" and reviewed "aggravating" and "mitigating" factors for its disposition. It held mitigating factors were D.S.'s low risk of recidivism and lack of a history of delinquency. "Aggravating factors" were the victim's age and vulnerability, the harmful long-term effects of the offense on the victim, and D.S.'s "rationale for the offense."

[¶28.]        We have not recognized punishment as a governing interest in reaching a juvenile disposition, and, in fact, we have affirmed that the goal of juvenile proceedings is not to punish but to rehabilitate.[4] *See In re S.K.*, 1999 S.D. 7, ¶ 11, 587 N.W.2d at 742. However, we cannot say the court's discussion of the factors in this case was improper as it may have informed the court's analysis—balancing the interests of D.S.'s rehabilitation and public safety—in reaching its disposition. The court did not clearly tie its discussion of these factors to a retributive interest or purpose. Further, although the court alluded to the "punishment" impact of its disposition, it correctly recognized that rehabilitation was its "primary goal;" and the court recognized rehabilitation must be considered and weighed with the effect of the court's disposition "from a safety prospective."

[¶29.]        First-degree rape is a serious offense that invokes important interests concerning rehabilitation for the juvenile, protection of the victim, immediate public safety concerns in the juvenile's community, and a public safety interest in reducing the juvenile's likelihood of recidivism once the juvenile has completed treatment and is no longer under the custody or supervision of the State. Nevertheless, a juvenile may not be committed to the DOC solely upon a determination that the juvenile committed one of the offenses enumerated under SDCL 26-8C-7(10). Despite a juvenile's adjudication for a qualifying offense, SDCL 26-8C-7(10) provides that "[t]he court *may only commit* a child to the Department of Corrections

---

4.      The traditional goal of rehabilitation in the juvenile justice system is consistent with SDCL 26-8C-7, governing the court's decree of disposition, enacted after the JJPSIA. The statute retains the requirement that a court enter a disposition in keeping with the best interest of the child, rather than punitive considerations.

*if the judge finds* that: (a) [n]o viable alternative exists; and (b) [t]he Department of Corrections is the least restrictive alternative." (Emphasis added).

[¶30.]        At the dispositional hearing, the circuit court did not consider whether there were other viable alternatives in the community.  In particular, the court failed to address Dr. Moss's reasons for recommending community supervision, including his conclusions that "there was no evidence of [D.S.] being sexually aroused by children, violence or the use of force;" D.S. could be appropriately supervised in the community during treatment; and D.S. would benefit from his mother's participation in treatment.  Additionally, the circuit court did not discuss or make any findings that D.S. presented a danger to the victim or the community at large if he were to be supervised in the community.  In fact, the court noted that D.S. had done well in the community for nearly a year before the trial, stating D.S. had "absolutely no issues" for "a long time" on pre-trial community monitoring.

[¶31.]        A court is not bound to adopt the recommendations and alternatives offered by an expert or court services at the dispositional hearing.  *See State v. Jensen*, 1998 S.D. 52, ¶ 54, 579 N.W.2d 613, 622 ("[T]he mere fact that an expert testifies does not mean that his or her opinion must be accepted by the trial court."). However, SDCL 26-8C-7(10) required the circuit court to consider the community-based alternative offered by Dr. Moss and CSO Liberty and conclude that DOC placement was the only viable and least restrictive alternative.  We are unable to discern from the record whether the circuit court did so in this case.  The court did not discuss alternatives to DOC placement and instead concluded its oral

disposition by stating, "the [c]ourt believes that [D.S.] would be best served . . . with the disposition of a placement in the Department of Corrections."

[¶32.]    Although the court's written findings of fact and conclusions of law stated "there are no other viable alternatives available in the community" and DOC "commitment is the least restrictive alternative," these after-the-fact written findings are insufficient to satisfy SDCL 26-8C-7(10).  "Findings must be entered 'with sufficient specificity to permit meaningful review.'"  *March v. Thursby*, 2011 S.D. 73, ¶ 20, 806 N.W.2d 239, 244 (citation omitted).  It may well be that the court's determination that there were no viable alternatives short of DOC commitment is supportable, but without understanding the court's assessment of viability given the state of the disposition record, we cannot say this is the case. "We cannot meaningfully review the trial court decision without the trial court's reasons for ruling the way it did."  *Goeden v. Daum*, 2003 S.D. 91, ¶ 7, 668 N.W.2d 108, 110.  A court may commit reversible error if its findings and conclusions are insufficient to permit a meaningful review of the issue.  *See Shroyer v. Fanning*, 2010 S.D. 22, ¶ 8, 780 N.W.2d 467, 471 (holding a "circuit court erred by not entering findings of fact and conclusions of law that would have permitted a 'meaningful review' of whether [a] protection order was appropriately granted" (citation omitted)).

[¶33.]    On this record, the Court would be left to speculate on whether the circuit court considered the community-based alternative offered at the hearing before committing D.S. to the DOC.  *See Luze v. New FB Co.*, 2020 S.D. 70, ¶ 26, 952 N.W.2d 264, 271-72 (remanding to the circuit court to make "findings of fact

detailing how the evidence presented by the parties supports the court's allocation" of economic and non-economic damages when the court's failure to make sufficient factual findings required "this Court . . . to engage in speculation to determine how the circuit court" reached its conclusion).

[¶34.]     On remand, the court should analyze the evidence contained in the record, explaining why it reached its dispositional findings and conclusions.  This explanation is essential because written findings that merely recite the necessary criteria for a DOC commitment, without either oral or written explanation, do not facilitate this Court's meaningful and accurate review for abuse of discretion and clear error.

[¶35.]     We reverse and remand for the circuit court to make findings on the viability of a community-based supervision and treatment alternative and to reimpose a disposition consistent with the requirements of SDCL 26-8C-7.

[¶36.]     KERN, SALTER, DEVANEY, and MYREN, Justices, concur.