#29563-a-JMK
**2022 S.D. 11**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

THE PEOPLE OF THE STATE OF SOUTH DAKOTA
IN THE INTEREST OF D.S., Child,
and Concerning A.S. and A.B., Respondents.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MATTHEW M. BROWN
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

MATTHEW W. TEMPLAR
Assistant Attorney General
Pierre, South Dakota                     Attorneys for petitioner and
                                         appellee, State of South Dakota.


OLE J. OLESEN of
Pennington County Public
    Defender's Office
Rapid City, South Dakota                 Attorneys for minor child, D.S.,
                                         and appellant.

* * * *

CONSIDERED ON BRIEFS
OCTOBER 4, 2021
OPINION FILED **02/09/22**

#29563

KERN, Justice

[¶1.] D.S., a fourteen-year-old male, was adjudicated for possessing a stolen motor vehicle and aggravated eluding. The court appointed an expert to conduct a psychological evaluation of D.S. prior to the dispositional hearing. At the hearing, D.S. requested a probationary sentence based on the expert's opinion that he could be treated in the community. The State requested that D.S. be placed with the Department of Corrections (DOC), arguing that D.S. had been on probation on four prior occasions for serious offenses, did not abide by the terms of probation and electronic monitoring, and was a risk to the community. The circuit court committed D.S. to the DOC. D.S. appeals this disposition, challenging the circuit court's findings that there was no viable alternative to DOC commitment and that a DOC commitment was the least restrictive alternative. We affirm.

## Factual and Procedural Background

[¶2.] On September 3, 2020, D.S. stole a Ford F-150 from the area around Canyon Lake in Rapid City, South Dakota. This was the fourth vehicle D.S. was alleged to have stolen since June 2019.[1] He and two of his friends, M.A. and K.A., stole the pickup to go on a joyride to Belle Fourche, South Dakota. Police stopped the pickup on the interstate, shortly after midnight on September 4, 2020, after pursuing it through the city of Sturgis.

[¶3.] Meade County Deputy Sheriff Jarrod Vandewater first noticed the pickup as he was walking out of the Sturgis Common Cents gas station on Junction Avenue when he saw it strike a curb and then drive away at a high rate of speed.

---

1. D.S. was born on January 6, 2006.

-1-

Deputy Vandewater pursued and caught up to the pickup. After the driver ran two stop signs, Deputy Vandewater activated his car's emergency lights. The pickup ran two more stop signs, cutting off two cars at the last intersection, before turning onto the I-90 on-ramp and driving on the shoulder of the interstate for half a mile before coming to a stop. Deputy Vandewater had called for reinforcement by this time and, because the pickup had been reported as stolen, performed a high-risk felony traffic stop with the assistance of Deputy Corey Jonas.

[¶4.] D.S., M.A., and K.A. were removed from the pickup which D.S. had been driving. D.S. volunteered that the pickup was stolen, and M.A. and K.A. admitted that they had helped D.S. steal it. The three juveniles were laughing, joking, and bragging about having stolen the pickup. Deputy Vandewater performed an inventory search on the pickup while waiting for a tow truck and found a loaded .22 caliber rifle and a loaded 9mm handgun. The juveniles reported that the guns were in the pickup when they stole it. D.S. was transported to the Juvenile Services Center (JSC) in Rapid City and remained there until September 8, 2020. D.S. was charged as a juvenile delinquent with three offenses: Count 1—Possession of a Stolen Motor Vehicle; Count 2—Aggravated Eluding; and Count 3—Possession of a Pistol by a Minor.

[¶5.] This incident was not D.S.'s first run-in with law enforcement. In July 2018, when D.S. was twelve years of age and living with his mother in Belle Fourche, he stole his mother's boyfriend's credit card and spent $700 on Amazon, PlayStation, and two pornography websites. This incident was adjudicated in Meade County, and D.S. was placed on probation for four months with ten days at

JSC suspended and payment of restitution. He was charged with violating the terms of his probation for not obeying the rules at home, failing classes at school, not attending court-ordered after school programs, being suspended from school, ignoring curfew, violating house arrest, and breaking windows and other property at his home.

[¶6.] Adjudication of the above probation violations occurred in Meade County on May 16, 2019, when D.S. was before the court for a new delinquency petition for offenses involving false reporting to authorities and impersonation to deceive law enforcement. This petition arose from an incident in March 2019, when D.S. called Belle Fourche law enforcement, gave a false name, and informed them that the middle school was on fire when it was not. For the probation violations and the new counts, D.S. was given six months of probation which required him to attend counseling and pay restitution.

[¶7.] From February to May of 2019, D.S., now thirteen years of age, attempted Moral Reconation Therapy as part of his Meade County probationary requirements but was dropped from the program for continued behavioral issues and non-attendance. D.S. was also receiving individual counseling with Dr. Dewey Ertz, Ed.D., an educational psychologist, as a condition of his probation. Dr. Ertz did a psychological assessment of D.S. on May 3, 2019. In June 2019, D.S. stole his mother's boyfriend's pickup and some beer. He took the pickup for a joyride while drinking three of the beers and smoking marijuana. He was brought before the Meade County circuit court for this incident on September 3, 2019. D.S. was

adjudicated as a delinquent and given six more months of probation and twenty days suspended at either JSC or the Rapid City Arise Youth Center[2] (Arise).

[¶8.] In October 2019, D.S., still living in Belle Fourche, stole his father's girlfriend's car and drove it to Spearfish, South Dakota. Around this time, Dr. Ertz began recommending inpatient treatment, and D.S.'s family was exploring a potential placement at Canyon Hills Treatment Center in Spearfish. Before securing this placement, the family decided against inpatient treatment in South Dakota, as D.S.'s father was moving to Arizona and D.S. wanted to move with him instead. Before the move to Arizona occurred, D.S. was brought before the Meade County court on December 4, 2019, for violating his probation by stealing his father's girlfriend's car in October. The court adjudicated D.S. for violating his probation and assessed only a fine so that D.S. could move with his father to Arizona. D.S. turned fourteen on January 6, 2020.

[¶9.] In Arizona, D.S. reportedly stole items from the homes of his father and other family members. He was also caught with marijuana after having stolen it from a family member. He moved back to South Dakota to live with his mother prior to the September incident at issue here, but the record is unclear exactly when he arrived in South Dakota. However, he was in the community, not on probation, and in his mother's custody on July 27, 2020, at which time he stole a vehicle in Rapid City to drive to Belle Fourche with two friends. D.S. drank alcohol while

2. The Arise Youth Center facility provides temporary shelter care for youths as an alternative to secure detention when possible. *Arise Youth Center*, https://lsssd.org/what-we-do/detention-alternatives/ariseyouthcenter.html (last visited Jan. 25, 2022).

driving the vehicle and the group threw the vehicle owner's belongings out of the car during the trip. D.S. was charged in October 2020 as a juvenile delinquent for the offense of grand theft in connection with this incident.

[¶10.] Following D.S.'s arrest and initial JSC detention for the September 3–4, 2020 theft at issue here, the court held a temporary custody hearing and placed D.S. at Arise. After nine days at Arise, D.S. was released into the community for supervision wearing an ankle monitor. On November 12, 2020, D.S. and the State entered into a plea agreement in which D.S. admitted to counts 1 and 2, possession of a stolen motor vehicle and aggravated eluding, of the State's petition. Pursuant to the plea agreement, the State then dismissed the remaining count of possession of a pistol by a minor and a pending petition alleging grand theft of a vehicle on July 27, 2020. The court adjudicated D.S. as a delinquent and set a dispositional hearing. In preparation for the hearing, the court ordered court services to prepare a juvenile social case study report (report) with recommendations. Additionally, the court ordered that D.S. obtain a psychological evaluation. D.S. remained on community supervision wearing an ankle monitor.

[¶11.] On November 30, 2020, D.S. violated the conditions of his release by letting the battery on his ankle monitor expire while staying at places other than his mother's house. D.S. and his mother told the community monitoring staff that D.S.'s girlfriend's house was D.S.'s uncle's house so that D.S. could stay there. Community monitoring staff went to the house and found D.S. hiding under his girlfriend's bed. D.S. was then placed back at Arise while awaiting his dispositional hearing.

[¶12.] D.S. got in trouble at Arise, however, by arguing with another juvenile and threatening to fight him. D.S. was escorted to another room to calm down where he subsequently threw a chair and let the water out of a water cooler. He was transferred to JSC after he settled down and remained there until his dispositional hearing.

[¶13.] The court services officer (CSO) assigned to prepare the report interviewed D.S. to obtain his history and background information. D.S. told the CSO that he did not believe he had a problem with alcohol, despite reporting blacking out and forgetting things when he drinks. D.S. reported that he did have a problem with marijuana, which he started using at age twelve. He stated that he vaped every day, had used mushrooms and huffed air duster several times, and had tried cocaine, Xanax, and acid, once each. The CSO also noted that D.S. had been diagnosed by Dr. Ertz with Childhood Onset Type Conduct Disorder, Asperger's Disorder, Borderline Intellectual Functioning, and Bipolar Disorder.

[¶14.] The CSO recommended in the report that D.S. receive residential substance abuse treatment that could simultaneously address his mental health problems which would require further psychiatric consultation and care. However, the CSO recommended against placing D.S. on either regular probation or in the juvenile intensive probation program (JIPP) because D.S.'s "continued escalating behavior[ ] leaves the community at risk." The report also noted that D.S. had been unsuccessful while being supervised in the community on an ankle monitor and struggled at Arise, requiring his placement at JSC. In conclusion, the CSO recommended that D.S. be placed with the DOC where he could obtain inpatient

services to address his Asperger's Syndrome[3] in conjunction with his "criminal thinking and behavioral patterns . . . ."

[¶15.] After being appointed by the court to evaluate D.S., Dr. Ertz met with him on December 8 and 19, 2020, for interviews and testing. In his report, Dr. Ertz noted that D.S. described being placed at JSC "on four occasions" and in the Arise program "at least four times." D.S. also reported having been to drug and alcohol treatment but not having finished the treatment program. Dr. Ertz referenced his May 2019 evaluation of D.S., noting D.S. was exhibiting symptoms of attention-deficit disorder at the time, for which he had been prescribed Vyvanse by another physician. Dr. Ertz did not feel that D.S.'s current behavior supported D.S.'s earlier diagnosis of Attention-Deficit/Hyperactivity Disorder (ADHD).

[¶16.] Additionally, Dr. Ertz determined that at the time of the evaluation, D.S., who was fourteen years old, had a mental age of 11.1 years old. Based on D.S.'s performance on several tests administered by Dr. Ertz, he determined that D.S. had a low borderline range IQ. Dr. Ertz concluded that D.S. "may display an additional diagnosis involving Asperger's Syndrome which is an Autism Spectrum Disorder." Dr. Ertz opined that an appropriate treatment plan for D.S. would need to include residential substance abuse treatment and psychiatric consultation with a focus on Asperger's Syndrome.

[¶17.] On January 22, 2021, the court held a dispositional hearing. Dr. Ertz was called by counsel for D.S. and testified that D.S.'s Asperger's Syndrome should factor into his rehabilitation because "people with this disorder model what's in

---

3. Throughout the record, D.S.'s diagnosis is referred to as both Autism Spectrum Disorder and Asperger's Syndrome interchangeably.

their environment without good understanding whether it's appropriate or inappropriate." In Dr. Ertz's opinion, commitment to the DOC presented "a risk factor in that because [D.S.] is like a chameleon, he picks up what's around him and displays it. So if you put him with peers that are higher functioning and are going to have the opportunities to generalize some of their behaviors as being appropriate, then he's more likely to take that on . . . ." Dr. Ertz testified that, as an alternative to DOC commitment, D.S. should receive long-term outpatient treatment for his mental health/Asperger's Syndrome. In his opinion, these services should be coordinated with an inpatient adolescent substance abuse treatment program in Rapid City followed by outpatient treatment. On cross examination, Dr. Ertz agreed that D.S. would "require or benefit most from treatment that would extend beyond any period of probation that the [c]ourt could potentially order." Dr. Ertz ultimately recommended a deferred prosecution as being in D.S.'s best interest.

[¶18.] Following Dr. Ertz's testimony, the court heard from the CSO who prepared the report and from D.S.'s mother. After hearing the arguments of counsel in support of their recommended dispositions, the circuit court remanded D.S. to the DOC, stating in part:

> The [c]ourt does ultimately rely on these findings: This is [D.S.]'s fifth time through the juvenile system. [D.S.] has been through probation a number of times before, and those probationary terms have, for the most part, been unsuccessful. There has been, and very likely because of his diagnosis, a lack of full follow-through and the [c]ourt would note a lack of support from [D.S.] in completing his probationary terms and requirements. I don't know that that is necessarily intentional. I think that goes back to his diagnosis. I think that it's going to require greater structure and greater oversight than what the probationary structure and outpatient structure will provide to him.

>The [c]ourt believes he needs a stable structure to address his mental health and his drug—the issues that he has with controlled substances, his substance abuse issues, and the [c]ourt notes his escalating behaviors and the risk that he poses to the community if he is out in the community on an outpatient basis.
>
>The [c]ourt believes that there are opportunities for him on probation and that he could go, as advocated by [defense counsel], into a treatment facility on probation, but the [c]ourt believes that, frankly, it's in his best interest and the interest of the community and the least restrictive alternative at this time, given his chances before, given his previous record on probation, his history of, and in the juvenile system, if he's committed to the Department of Corrections.

[¶19.]    After the dispositional hearing, the court entered written findings of fact and conclusions of law which included the following:

>#4    There is no question that the minor child will require some attention now and in the future to address how his mind works and how he approaches things. The long-term consequential thinking of a person with the minor child's diagnosis does not exist and that led the minor child to some dangerous behaviors that have brought him before the [c]ourt.
>
>#5    The minor child's use of illegal substances has compounded the escalating issues he has had in the juvenile court system.
>
>#6    This is the minor child's fifth time through the juvenile court system and he has been unsuccessful on probation all times. There has been a lack of full follow-through and a lack of support in completing probation.
>
>#7    The minor child requires greater structure and oversight than probation and outpatient services can provide. The [c]ourt believes that the minor child needs a structured environment to address his mental health and substance abuse issues.
>
>#8    The [c]ourt notes the minor child's escalating behaviors and believes he poses a significant risk of danger to the community if he is out in the community on an outpatient basis. The [c]ourt believes it would be in the minor child's best interests and the community's best interests to be committed to DOC, due to the minor child's history and the risk of having him

in the community, not following through with probation, and reoffending.

#9    There are no other viable alternatives available in the community.

#10    The [c]ourt finds that commitment to the Department of Corrections is the least restrictive alternative available in the best interests of justice.

[¶20.]    D.S. appeals, raising one issue which we restate as follows—whether the circuit court abused its discretion by committing D.S. to the Department of Corrections under SDCL 26-8C-7(10).

## Standard of Review

[¶21.]    "In reviewing a court's order of disposition in a delinquency proceeding, we consider whether or not the trial court abused its discretion or otherwise committed an error of law requiring reversal." *Matter of J.M.*, 1996 S.D. 42, ¶ 14, 546 N.W.2d 383, 386 (citations omitted). An abuse of discretion is "a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which on full consideration, is arbitrary or unreasonable." *State v. Stone*, 2019 S.D. 18, ¶ 34, 925 N.W.2d 488, 499–500 (citation omitted). We review a circuit court's findings of fact in a juvenile delinquency proceeding using the clearly erroneous standard. *People ex rel. R.L.G.*, 2005 S.D. 119, ¶ 6, 707 N.W.2d 258, 260. "Clear error is shown only when, after a review of all the evidence, we are left with a definite and firm conviction that a mistake has been made." *Id.* Here, the findings of fact as to whether there was no viable alternative to DOC commitment and whether DOC commitment was the least restrictive alternative are evaluated using the clearly erroneous standard, while the overall dispositional decision to commit

D.S. to the DOC under SDCL 26-8C-7(10) is an application of law subject to abuse of discretion review. *People in Interest of D.S.*, 2021 S.D. 63, ¶ 20, 967 N.W.2d 1, 6.

### Analysis and Decision

[¶22.] When committing a juvenile to the DOC, circuit courts must comply with SDCL 26-8C-7(10), which states that:

> The court may only commit a child to the Department of Corrections if the judge finds that:
> (a) No viable alternative exists; and
> (b) The Department of Corrections is the least restrictive alternative; and one of the following:
> > (i) . . . the court finds from evidence presented at the dispositional hearing or from the pre-dispositional report that the youth presents a significant risk of physical harm to another person . . . .

The policy underlying these required findings is to ensure that courts "liberally construe[ ]" the laws on juvenile delinquency proceedings "in favor of the child, the child's parents, and the state . . . for the purposes of affording guidance, control, and rehabilitation of . . . any delinquent child." SDCL 26-7A-6.

[¶23.] D.S. did not dispute that element (i) was met in this case, rather he argues that the DOC remand failed to meet elements (a) and (b) of the statute.[4] Element (a) requires the court to make a determination as to the viability of existing alternatives, while element (b) requires the court to determine if DOC commitment is the least restrictive. In most cases, the existence of a viable alternative will preclude DOC commitment from being the least restrictive option.

---

4. The interim adjudicatory order and final dispositional order reference the delinquency determination per SDCL 26-8C-2 but do not cite SDCL 26-8C-7(10).

-11-

Importantly, the overarching principle by which a court must abide in juvenile delinquency proceedings is to make decisions in the best interests of the child. SDCL 26-7A-5. Such decisions must be balanced simultaneously with the protection of the public.

[¶24.] In 2015, the Legislature enacted the Juvenile Justice Public Safety Improvement Act (JJPSIA), which included adding the provisions of SDCL 26-8C-7 quoted above, not only to improve juvenile rehabilitative outcomes, but also to "increase public safety." *D.S.*, 2021 S.D. 63, ¶ 23, 967 N.W.2d at 7; *see also* S.B. 73, 90th Leg., Reg. Sess. (S.D. 2015). "Protection of society must be sought whether accomplished through rehabilitation or incarceration. Obviously rehabilitation is the preferred route in dealing with juveniles, but it cannot be accomplished in all cases." *People in Interest of Y.C.*, 1998 S.D. 76, ¶ 43, 581 N.W.2d 483, 490.

[¶25.] D.S.'s argument that the circuit court erred by remanding him to the DOC can be broken into three main parts.[5] First, he contends that there were viable dispositional alternatives for treating him in the community rather than remanding him to the DOC. He defines "viable" for this determination as any alternative that is "capable of success." Second, D.S. contends that the circuit court recognized that a viable alternative existed but impermissibly chose a DOC

---

5. In his reply brief, D.S. raises for the first time an issue regarding discrimination under the Americans with Disabilities Act (ADA) based on D.S.'s diagnosis of Asperger's Syndrome. This issue was never raised below nor raised as an issue in D.S.'s initial brief. We do not address issues that are raised for the first time on appeal, particularly in a reply brief; therefore, we do not consider D.S.'s ADA discrimination argument here. *See State v. Stanley*, 2017 S.D. 32, ¶ 26, 896 N.W.2d 669, 678 ("This Court will not address arguments that are raised for the first time on appeal.") (citation omitted).

commitment instead. Third, D.S. argues that Dr. Ertz's expert opinion that an alternative to commitment was available, especially in light of D.S.'s new Asperger's Syndrome diagnosis, should control the circuit court's decision as to whether a viable alternative exists and whether DOC commitment is the least restrictive alternative. For the reasons set forth below, we affirm the circuit court's decision to remand D.S. to the DOC.

### *Defining a "Viable" Alternative*

[¶26.]      D.S. contends that a "viable alternative existed and was recommended by the court ordered psychologist [Dr. Ertz] and because of that, placement with DOC was not the least restrictive disposition." D.S., using Black's Law Dictionary, defines "viable" as "capable of succeeding." *Viable*, Black's Law Dictionary (11th ed. 2019). The State counters that "viable" should be defined as "having a reasonable chance of succeeding." *Viable*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/viable (last visited Jan. 25, 2022). The State argues that we typically turn first to standard English dictionaries to determine the plain and ordinary meaning of a word, rather than a legal dictionary, citing for support *Sapienza v. Liberty Mutual Fire Ins. Co.*, 2021 S.D. 35, ¶ 18, 960 N.W.2d 829, 835 (applying this dictionary preference in the context of insurance contracts). D.S. responds in his reply brief by proposing an alternative definition from Merriam Webster Online Dictionary's list of definitions of viable, as "capable of working, functioning, or developing adequately." *Viable*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/viable (last visited Jan. 25, 2022).

[¶27.] We conclude that the definition of "viable" as "having a reasonable chance of succeeding" is the most practical and is logically consistent with the purpose of SDCL 26-8C-7(10) and the role of juvenile court proceedings. In applying this definition, a court must further consider what constitutes success. *See Success*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/success (last visited Jan. 25, 2022) (defining "success" as a "favorable or desired outcome"). The juvenile court judge bears the unique responsibility of evaluating the child's capacity for rehabilitation in light of the services available in order to promote the best interests of the child. Part of this consideration, however, involves the comparative risk to the community while the rehabilitation of the young person is attempted utilizing local treatment options. Put another way, the court must balance public safety concerns with the best interests of the juvenile before it. The court is not obligated to place a juvenile in an alternative setting with only a remote possibility of success that unduly endangers the community. Additionally, this definition of viability is in harmony with our existing case law regarding the weight to which a court must give an expert's opinion regarding the existence of viable alternatives, as discussed below.

***Whether the Circuit Court Found that a Viable Alternative Exists***

[¶28.] D.S. contends that the circuit court "concede[d] the fact that probation and local treatment are viable options." D.S. quotes the circuit court as saying, "The [c]ourt believes that there are opportunities for [D.S.] on probation and that he could go . . . into a treatment facility on probation . . . ." But this quotation leaves

off the second half of the circuit court's sentence. In its entirety, the circuit court stated:

> The [c]ourt believes that there are opportunities for [D.S.] on probation and that he could go, as advocated by [defense counsel], into a treatment facility on probation, but the [c]ourt believes that, frankly, it's in his best interest and the interest of the community and the least restrictive alternative at this time, given his chances before, given his previous record on probation, his history of, and in the juvenile system, if he's committed to the Department of Corrections.

From our review of the record, it is evident that the circuit court considered the option of placing D.S. into a treatment facility as a condition of probation but reasoned that based on D.S.'s previous history and lack of cooperation with services offered to him, probation was not a viable option.

[¶29.]     Moreover, the circuit court expressly found that "[t]here are no other viable alternatives in the community." This statement meets the SDCL 26-8C-7(10) requirement that the court find that no viable alternative exists, and when coupled with the court's written factual findings numbered 4–10 and the record available for our review, it is apparent that no abuse of discretion occurred here. D.S. stole multiple cars and drove while under the influence with minor passengers in the car, physically endangering himself and the general public. He was out of the control of his family while in their custody, and he had been unsuccessful on probation multiple times. He did not comply with the terms of community monitoring or cooperate with several mental health treatment opportunities made available to him.

### *Dr. Ertz's Testimony Regarding Alternatives for D.S.*

[¶30.]     D.S. contends that because Dr. Ertz opined that an alternative to DOC commitment existed, the circuit court was bound by this opinion. The State responds that "[t]he circuit court was not required to blindly accept Dr. Ertz's testimony about the appropriate placement option in this case. It had to weigh the input from Dr. Ertz, Court Services, and [D.S.'s mother]." Furthermore, the State points out that Court Services recommended a DOC commitment and that on cross examination, Dr. Ertz agreed that D.S. "would require or benefit most from treatment that would extend beyond any period of probation that the [c]ourt could potentially order."

[¶31.]     When faced with differing opinions, it is the circuit court's job to weigh the opinions and evidence and come to a conclusion. Requiring the circuit court to conclude that a viable alternative exists merely because of an expert's opinion that one exists would strip the court of this important responsibility. A court's role, when "sitting as the fact finder, is [to serve as] the sole judge of the credibility of the witnesses and [the court] can accept or reject all or part of the expert's testimony." *State v. A.B.*, 2008 S.D. 117, ¶ 19, 758 N.W.2d 910, 916 (citation omitted). An expert's role, on the other hand, is to "assist the trier of fact to understand the evidence or to determine a fact in issue . . . not to tell the trier of fact what to decide, shifting responsibility from the decision maker to the expert." *State v. Buchholtz*, 2013 S.D. 96, ¶ 28, 841 N.W.2d 449, 459 (citations omitted). Because of these differing roles, "[t]he mere fact that an expert testifies does not mean that his or her opinion must be accepted by the trial court." *A.B.*, 2008 S.D. 117, ¶ 19, 758 N.W.2d

at 916 (citation omitted). Regarding D.S., the circuit court "surely was not obligated to indiscriminately accept the expert testimony wholesale . . . ." *State v. Klinetobe*, 2021 S.D. 24, ¶ 35, 958 N.W.2d 734, 742.

[¶32.] Here, the circuit court did not accept Dr. Ertz's opinion that a viable alternative to DOC commitment existed. Rather, the circuit court weighed Dr. Ertz's opinion, Court Services' recommendation, D.S.'s mother's comments, and the community alternatives available for D.S. The court also considered D.S.'s escalating behaviors and the public safety risk of reoffending in light of his prior behavior while on probation, under community supervision, at Arise and at JSC. After weighing this information, the circuit court concluded that the alternatives to DOC commitment were not viable, i.e., they did not present a reasonable chance of succeeding. In so concluding, the circuit court did not abuse its discretion, but rather fulfilled its unique obligation to determine the proper disposition for the child to help achieve the best services available to further his rehabilitation while still protecting the public.

[¶33.] D.S. also highlights Dr. Ertz's testimony regarding D.S.'s recent diagnosis with Asperger's Syndrome. D.S. contends that because he had not been diagnosed with Asperger's Syndrome when he failed on probation and in community alternatives, the circuit court abused its discretion by failing to consider how probation could be different for D.S. with treatment sensitive to his new diagnosis. This argument is unavailing. The circuit court specifically considered D.S.'s Asperger's Syndrome diagnosis and its effect on his ability to be successful outside of a DOC commitment when reaching its conclusion. Ultimately, the court

concluded that D.S. "required greater structure and oversight than probation and outpatient services could provide," and that providing these services to D.S. in an outpatient setting posed a significant risk of danger to the community.

[¶34.]     For the aforementioned reasons, the circuit court did not abuse its discretion, nor did it clearly err in finding that there was no viable alternative to a DOC commitment, which was the least restrictive alternative available in this case. We affirm.

[¶35.]     JENSEN, Chief Justice, and DEVANEY and MYREN, Justices, concur.

[¶36.]     SALTER, Justice, concurs in part and dissents in part.

SALTER, Justice (concurring in part, dissenting in part).

[¶37.]     I agree with the Court's conclusion that we should affirm the circuit court's dispositional order. But I confess some degree of difficulty distinguishing the least-restrictive-alternative standard from the no-viable-alternative requirement. If, as the first sentence of SDCL 26-8C-7 commands, a circuit court is obligated in *all* adjudicated juvenile cases to "enter a decree of disposition according to the least restrictive alternative available[,]" I am not certain what SDCL 26-8C-7(10)(a)'s specific no-viable-alternative requirement adds. And I am equally unsure how the restated least-restrictive-alternative standard appearing in SDCL 26-8C-7(10)(b) could apply any differently than the version that appears at the beginning of the statute.

[¶38.]     It seems difficult, if not impossible, to conceive of a case in which a court meets its obligation to determine that committing a juvenile to the DOC is the least restrictive alternative available, while simultaneously overlooking a viable

alternative.  For this reason, I cannot accept the Court's effort to construe SDCL 26-8C-7(10) by stating, "[i]n most cases, the existence of a viable alternative will preclude DOC commitment from being the least restrictive option."  *See supra* ¶ 23. A finding that a viable alternative exists will *always* preclude DOC commitment which is, by its nature, the most serious, and "restrictive," alternative.

[¶39.]      However, the parties have not suggested the standards are duplicative, and we generally operate under the belief "that the Legislature intended that no part of its statutory scheme be rendered mere surplusage." *Peters v. Great W. Bank, Inc.*, 2015 S.D. 4, ¶ 8, 859 N.W.2d 618, 622 (quoting *Faircloth v. Raven Indus., Inc.*, 2000 S.D. 158, ¶ 6, 620 N.W.2d 198, 201).  In my view, we should leave any effort to construe the least-restrictive-alternative and no-viable-alternative standards for another day.